406 So.2d 143 (1981)
STATE of Louisiana
v.
Larry BOYER.
No. 81-KA-0127.
Supreme Court of Louisiana.
November 16, 1981.
*144 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., David Loeb, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Robert T. Garrity, Jr., of Indigent Defender Board, New Orleans, for defendant-appellant.
*145 BLANCHE, Justice.
Defendant, Larry Boyer, was found guilty of second degree murder and sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. On this appeal, nine assignments of error were urged; however, two other assignments were made but were neither briefed nor argued and were, therefore, considered abandoned. There were no witnesses to the killing and the evidence against the defendant was entirely circumstantial. The following is a factual resume of the evidence bearing on the commission of the crime.
On September 13, 1979 between dusk and 9:00 p. m., Mrs. Rena Sandoz was killed by a single gunshot wound to her head. Ballistic tests revealed that the fatal shot was fired from a .38 caliber Smith & Wesson revolver which belonged to the victim's son, Harold Sandoz. The revolver was found underneath the victim's body and no blood nor fingerprints, or even partial prints, were found thereon. Mrs. Sandoz' brain was literally blown away and scattered across her bedroom walls and ceiling. Pieces of her skull were never recovered, and the pathologist was unable to reconstruct the wound. He noted that the bullet apparently entered her head from the right side in the rear of the temple and travelled in a more or less horizontal path across the brain. He also noted bruises and abrasions on her arms and chest consistent with the fall, or firm manipulation or handling of the victim.
Mrs. Rena Sandoz was an invalid and suffered severely from emphysema. She had recently been released from the hospital, was taking medication, and it was necessary for her to breathe at times with the aid of an oxygen generating machine in her bedroom.
Harold Sandoz, who had recently moved into his mother's home with his wife, Donna, and baby, had arranged the defendant's presence in his mother's home.
The evidence concerning defendant's presence in the Sandoz home at the time of the killing is found in the testimony of Harold Sandoz and the statements taken from the defendant. Harold Sandoz met the defendant in a junkyard shortly before the killing. His invitation to the victim's home was evidently one of mutual convenience, as the defendant was without money and a place to stay, and was also drug oriented to the extent that the defendant was to obtain drugs for Harold Sandoz, who would put up the money. In fact, on the afternoon of the killing, according to defendant's statement, he and Harold had each mainlined 5 preludin tablets. According to Sandoz, the defendant was also to replace a water pump in Sandoz' car and by early evening of September 13, 1979, defendant had obtained a replacement for the water pump but had not installed it because he purportedly needed some socket wrenches and a jack which Harold did not have.
During Harold and Donna Sandoz' absence to obtain the necessary tools for the defendant to install a water pump, the following evidentiary facts are pertinent. The defendant was told by Harold Sandoz to stay outside the house as his mother was afraid to stay in the house alone with the defendant. From outside the house, the defendant heard and answered two telephone calls, one from Harold Sandoz and another from a friend of Harold's. The defendant, although allegedly present outside the house when Mrs. Sandoz was killed, did not hear a shot. It was estimated that the Sandoz' were absent from the house for approximately 1½ hours and that Mrs. Rena Sandoz was alive when they left and dead upon their return. It was drizzling rain when the defendant met the Sandoz couple in the rear of the house.
In his statement, defendant claimed he only went inside twice to answer the telephone. He further claimed that he was on the rear porch and went inside the garage some 35 feet away from the house when it began to rain. He denied hearing a gunshot, although he admitted to hearing the telephone ringing from the garage.
The police recovered $154 in cash from the victim's bed, which was found between the mattresses. A paper bag was placed around the hands of the corpse to enable *146 subsequent neutron activation testing. The defendant submitted to a neutron activation test while in jail later that evening. The test will determine whether or not a person has fired a weapon. The expert witness, who conducted the test, stated that the samples taken from the hands of the defendant showed results consistent with a person who had recently fired a hand weapon. The expert further testified that all handguns do not discharge the elements tested, but the murder weapon in this case discharged such elements, namely, antimony and barium.
The police also conducted an audible test to determine whether a person in the garage at the victim's house could hear a telephone ring and a gunshot inside the victim's house. The results of these tests indicate that a gunshot could be distinctly heard, while the ring of a telephone is virtually inaudible.

Assignments of Error Numbers 2 and 3
The defendant contends that the court erred in accepting FBI Special Agent John Riley as an expert witness in the field of elemental analysis and in allowing him to testify beyond his expertise. Agent Riley conducted the neutron activation test and interpreted the results.
Agent Riley received a B.S. degree in Chemistry from Wisconsin University. He then obtained a M.S. in Forensic Science at George Washington University. He has attended several schools in neutron activation analysis and has had a year of extensive training in an elemental analysis unit of the FBI laboratory. He is a qualified examiner in an elemental analysis unit and has worked in the FBI's unit for thirteen years. He has also been accepted as an expert in this field in forty-three state courts and federal court.
A trial judge is vested with wide discretion in determining the competence of an expert witness. State v. Drew, 360 So.2d 500 (La.1978); State v. Titus, 358 So.2d 912 (La.1977). It is apparent Agent Riley is well qualified by both education and experience as an expert on the neutron activation test and the trial judge did not err in accepting him as such.
Defense counsel also contends that the trial court allowed Agent Riley to testify in a field beyond his expertise. Riley testified concerning the effect washing his hands would have had on the antimony and barium deposits on Boyer's hands. Mr. Riley's expertise should not be so narrowly construed. His education and experience qualified him to testify concerning factors like this that he would have to consider to accurately conduct and interpret the neutron activation test.

Assignment of Error Number 1
The defendant contends the trial court erred in denying a motion to suppress the results of the neutron activation test asserting that he should have been given an opportunity for independent testing and that the results were inadmissible hearsay.
This is the first time this Court has considered the admissibility of a neutron activation test, the purpose of which is to determine whether or not a person has recently fired a hand weapon. It is conducted by running a Q-tip on the web between the thumb and first finger of the subject to be tested. The cotton swab on the Q-tip can then be tested to determine if any barium or antimony was present on the subject's hands. These elements are discharged when a hand gun is fired and a neutron activation test performed on these swabs will detect both the presence and the amount of these two elements. Essentially, the test consists of placing the swab in the core of a nuclear reactor and bombarding it with neutrons. This causes the elements on the swab to become radioactive and to emit gamma rays, which are analyzed by the test.
Because the process causes the elements to become radioactive, Agent Riley testified that the Nuclear Regulatory Commission requires that the swabs be dissolved and disposed of in approved containers.
Although the defendant does not assert that the test is unreliable, we note that it is *147 the subject of widespread acceptance. In 15 Am.Jur., Proof of Facts (1973 Supp., p. 22), 78 cases are listed in which the results of neutron activation analyses were admitted in evidence. The test was discussed by the Minnesota Supreme Court in State v. Spencer, 216 N.W.2d 131 (Minn. 1974), where the Court stated, "We believe that neutron activation analysis is a useful law-enforcement technique and that the increasing use of technology in criminal investigation should not be inhibited but encouraged where consistent with the rights of the accused." The Missouri Court of Appeal gave its view in State v. Johnson, 539 S.W.2d 493 (Mo.1976). The court there stated the following:
"The general rule is that results of scientific tests and expert opinions based thereon are admissible only if the scientific principle involved is generally considered reliable and accurate by the concerned scientific community. Gunshot residue testing by neutron activation analysis meets this requirement. Neutron activation analysis has proven to be a highly reliable technique for detecting gunshot residue and for determining whether a person has recently handled or discharged a firearm. Reliability of evidence obtained by this means was settled in Missouri in State v. Ross, 523 S.W.2d 841, 845[5] (Mo.App.1975) which held that `firearm residue testing by neutron activation analysis has crossed the line between the experimental and demonstrable stages and the evidential force of the principle must be recognized.'"
Cases from other jurisdictions are not binding on this Court; however, the excerpts above do indicate the general admissibility of this test in other states.
At trial, Agent Riley gave a detailed explanation of the procedure he used in conducting the neutron activation test and the defendant then had the opportunity to challenge the accuracy and reliability of it during his cross-examination. The defense counsel questioned him extensively concerning the conditions under which the test was conducted and the safeguards taken to assure its validity. Also, though a test is no more reliable than the person who conducts it, it is apparent that Agent Riley was extremely competent in this area.
The defendant first argues that the test results should have been suppressed because the defense was not given an opportunity to examine the swabs and conduct independent testing. However, the applicable law is C.Cr.P. art. 719, which states:
"Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial." Added by Acts 1977, No. 515, § 1.
The prosecution provided defense counsel with a copy of the test results in compliance with C.Cr.P. art. 719 and this gave the defendant a chance to review the results and formulate any questions he had concerning them.
The defendant also argues that the test results were inadmissible hearsay. This argument is not persuasive. The test results do not assert anything by themselves. The results are meaningless without interpretation by an expert. It was Special Agent Riley who made the assertions based on his interpretation of the test results and he was available at trial to answer any questions defense counsel had regarding the validity of the test or its interpretation.
This assignment lacks merit.

Assignment of Error Number 4
The defendant argues that the trial court erred in failing to strike the testimony of Agent Riley because his opinion as to *148 the likelihood that the defendant fired the weapon was not phrased as a "reasonable scientific certainty." Agent Riley concluded that the amounts of antimony and barium found on the defendant's right hand "are typical of the amounts of antimony and barium found in the hand of a person who has discharged a firearm or had his hand near a discharging firearm."
R.S. 15:464 provides:
"On questions involving a knowledge obtained only by means of a special training or experience the opinions of persons having such special knowledge are admissible as expert testimony."
There is not any restriction in R.S. 15:464 limiting the opinions of experts to those that are of a "reasonable scientific certainty;" therefore, Agent Riley's testimony was admissible. Further, Louisiana does not recognize a motion to strike testimony.

Assignment of Error Number 5
Defendant argues that he was misled when he was informed that the swabs had been consumed after testing as he later found that the stick portion had not been destroyed and one of the sticks still had "minuscule wisps" of cotton. He asserts that this constituted a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and contends that he should have been granted a mistrial on the basis that the state deliberately withheld exculpatory evidence. However, we agree with the trial court's finding that this was not an attempt to mislead on the part of the prosecution but, rather, Agent Riley meant there was not enough of the cotton left to test when he said the Q-tip had been consumed in testing. The stick itself would be of no value.
This assignment is without merit.

Assignment of Error Number 6
Counsel for the defense also argues that the trial court erred when it allowed photographs of the victim and the scene of the killing in evidence. The state introduced twenty-six 8" × 10" color photographs and the defense contends that they were not probative and were so gruesome that they inflamed the passions of the jury against Boyer.
The test for admissibility of allegedly gruesome photographs is whether their probative value outweighs any prejudicial effect. A trial court's ruling in this regard will only be disturbed if the prejudicial effect of the photographs clearly outweighs the probative value. State v. Landry, 388 So.2d 699 (La.1980); State v. Unger, 362 So.2d 1095 (La.1978); State v. Bryant, 351 So.2d 1188 (La.1977). Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Valentine, 364 So.2d 595 (La.1978).
Of the twenty-six photographs admitted, several seemed to have only a minimal probative value; however, these also appeared to have no prejudicial effect. Included in this category would be three pictures of the revolver taken at the scene. The revolver itself was admitted so these photos may have been cumulative, but they were not prejudicial. Also, there were several photographs showing the bedroom where the victim was found. These photos were not gruesome and could have been beneficial to the jury in aiding them to visualize the scene. There are only nine photographs of the victim herself taken from various angles in the room. While these pictures are the most gruesome, they are also the most probative. The defense contended at trial that Mrs. Sandoz might have committed suicide. These pictures showed the position of the victim after the shooting and the angle of the entry of the bullet. Both of these factors could help the jury determine whether or not they believed the victim had been murdered or had committed suicide. Many of the photographs were gruesome because Mrs. Sandoz was murdered in a violent and brutal manner. However, we cannot say the prejudicial effect clearly outweighed the probative value.

*149 Assignment of Error Number 7

In this assignment of error, defendant argues that the trial court erred in allowing Chief Ranatza of the Harahan Police Department to give his opinion as to whether or not a bolt on an automobile had been removed and replaced. This question arose because there was a dispute about whether or not any repair work had been done to the car while Donna and Harold Sandoz were gone. It appears from the record that Chief Ranatza was merely explaining why it appeared to him that the engine had not been worked on.
Even if Chief Ranatza did give an opinion on redirect without being qualified as an expert, it was harmless error. On direct examination, the Chief testified without any objection that the car had not been worked on, and that the engine, including the water pump, had not been tampered with. It was only on the redirect that defense counsel objected to Chief Ranatza testifying as to whether or not he thought a nut had been loosened. The identical information given on redirect over the objection of the defense had already been given in the direct examination without any objection being raised.
This assignment is without merit.

Assignment of Error Number 9
The next argument of defendant is that the trial court erred in admitting a decibel recording test which indicated that a gunshot could have been heard in the garage while the ringing of a telephone could not. This was important since the defendant claimed that he heard the telephone ringing two separate times while he was outside, but did not hear a gunshot. The main objection is that in conducting the test, the police failed to simulate the sound of rain falling on the garage roof since there was testimony that it was raining or drizzling when Donna and Harold Sandoz returned home. However, it appears that the police officers conducting the test did attempt to reconstruct the conditions existing on the night of the incident in all other respects. The police discharged the weapon used in the killing into sandbags in the victim's bedroom while the air conditioner, the dryer and the television were on.
The probative value of such an experiment or reconstructed evidence depends in large measure upon the extent to which the reconstructed scene was identical with or similar to that which existed at the time the incident happened. State v. Brumfield, 329 So.2d 181 (La.1976). Here, the only sound that was not included in the test was that of rain falling on the roof. The test would have more accurately recreated the situation existing on the night Mrs. Sandoz was killed if the sound of the rain had been present. However, in this case, the primary importance of the test was to show the relative loudness of the sound of a gunshot as compared to the sound of a ringing telephone. This test was only introduced to show that if the telephone was audible outside, so was the gunshot. The gunshot had a reading of 96 decibels, while the sound of a telephone ringing did not register at all on the audible decibel reader when measured in the garage. Even if the sound of rain on the roof would have made the gunshot more difficult to hear, it would also have made the telephone more difficult to hear. Since defendant claimed he heard the telephone ringing on two separate occasions but never heard a gunshot, the results of the audible decibel test were only used to show that if he heard the phone, he also should have heard the gunshot. Since the test was used to compare the volume of two different sounds rather than to determine whether or not a sound could be heard, the fact that the sound of the rain was not simulated did not require the results of the test to be excluded.

Assignment of Error Number 11
Defendant's final assignment of error is that the trial court erred in failing to grant a new trial because the evidence was insufficient to support a guilty verdict. He alleges a lack of direct circumstantial evidence indicating a specific intent to murder Mrs. Sandoz. R.S. 14:10 defines specific intent as follows:

*150 "(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
However, specific intent is a state of mind, and need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Holmes, 388 So.2d 722 (La. 1980); State v. Williams, 383 So.2d 369 (La. 1980); State v. Procell, 365 So.2d 484 (La. 1978).
R.S. 15:438 provides:
"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
In this case, the evidence excluded every reasonable hypothesis of innocence and was sufficient to find that Larry Boyer did kill Mrs. Sandoz. It can be inferred from the fact that the defendant shot Mrs. Sandoz in the head at close range that he actively desired her death to follow his act.
This assignment is without merit.
For the reasons assigned, the defendant's conviction and sentence are affirmed.
AFFIRMED.