496 So.2d 576 (1986)
STATE of Louisiana
v.
Herbert VESSELL.
No. 86KA0254.
Court of Appeal of Louisiana, First Circuit.
October 15, 1986.
Writ Denied January 23, 1987.
*578 Bryan Bush, Dist. Atty., Baton Rouge by Louis Daniel, Asst. Dist. Atty., for plaintiff-appellee.
Johnny Wellons, Baton Rouge, for defendant-appellant.
Before LOTTINGER, SHORTESS and CARTER, JJ.
CARTER, Judge.
This is an appeal by the defendant, Herbert Vessell, from a second degree murder conviction.

FACTS
On the evening of June 12, 1983, defendant, Herbert Vessell, shot and killed Don Lineau. According to the trial testimony of Baton Rouge police officer Robert Lively, he was dispatched to a south Baton Rouge neighborhood to investigate a shooting incident. Since Officer Lively was in the immediate vicinity, he arrived on the scene in less than one minute. While en route, he observed a black Monte Carlo automobile operated by a black male maneuver through a red traffic light at a high rate of speed. Officer Lively noted the vehicle's license plate number as he was suspicious that the occupants of that vehicle might be involved in the reported shooting incident.
As Officer Lively reached his destination, he noticed a man, later identified as Don Lineau, stagger from a small utility building located in the backyard of a Pear Street residence. Other crime scene investigators discovered blood stains on the driveway of an adjacent residence; one set of blood stains was located where the driveway adjoined Pear Street and another set of bloodstains was located where the driveway curved around to the backyard.
Don Lineau was pronounced dead on arrival at a local hospital. Dr. Hypolite Landry, Jr., who performed an autopsy on the victim, testified that Don Lineau died from shock due to loss of blood occasioned by two small caliber gunshot wounds to his right chest. One bullet was recovered and determined to have been fired from a .22 caliber weapon.
Events leading to Don Lineau's death were reconstructed by interviewing witnesses to the incident, whose reported observations differed. However, it was generally agreed that Don Lineau and defendant were both seen at a nearby public *579 swimming pool immediately preceding the shooting.
Joseph Lineau, Don Lineau's cousin, testified that he and the victim spent that afternoon at a public swimming pool. During the late afternoon, he observed the victim in the recreational area parking lot talking with a young woman, later identified as Ruby Ann Kirkland (defendant's girlfriend). Defendant, who was seated next to the pool, apparently observed the conversation because he came out of the pool area and told the victim not to talk to his "little lady." As defendant walked to his parked automobile, the victim followed him. Defendant then reached inside his car, pulled out two guns and began firing. In response to the gunshots, the unarmed victim ran between parked cars and down Pear Street with defendant in close pursuit. The victim ran into the yard of a Pear Street residence, and Joseph Lineau heard "a couple of" shots fired. As Joseph Lineau approached the victim, he saw defendant, who was still armed with two guns, run back to his parked car.
Charles Thomas, another state witness, testified that he was not personally acquainted with either defendant or the victim. However, he did observe the victim conversing with a young lady in the swimming pool parking lot. He also saw defendant exit the pool area and proceed to a parked car where he obtained two pistols. Mr. Thomas opined that defendant armed himself with a .38 caliber and a .32 caliber weapon. As defendant began firing, the unarmed victim ran down Pear Street. Defendant pursued the victim, and Mr. Thomas followed the two men. When the victim turned into a Pear Street yard, Mr. Thomas saw the victim flinch as if hit by a bullet. Mr. Thomas watched through a neighbor's fence and saw defendant walk into the yard that the victim had entered and fire another shot. Marvel Hughes, an occupant of the house located on that property, confirmed that approximately three shots were fired outside his home.
Three lifeguards on duty at the public swimming pool, Maylon Brooks, Willie Freeman, and Cenetra Harris, also observed the incident between defendant and the victim preceding Don Lineau's death. Maylon Brooks testified that he heard a series of firecracker-type sounds and then saw two men running down Pear Street. After losing sight of the men, he heard the sound of three shots being fired. Willie Freeman's observations were consistent with those of Mr. Brooks; however, he was also able to discern that the man chasing the victim was armed with two guns. Cenetra Harris testified that she was in a position to observe the initial contact between defendant and the victim. She saw defendant approach the victim who was talking with a woman. Thereafter, the two men walked to defendant's car. Defendant reached inside his car, pulled out two guns, and started firing. Initially, the victim tried to avoid the gunfire by running between parked cars. As the gunfire persisted, the victim ran down the street with the armed man in pursuit. She also heard three or four shots fired after losing sight of the men. Moments later, Ms. Harris saw defendant return to his parked car and drive away.
After taking statements from Joseph Lineau and Charles Thomas, Detective R.H. Ryan, Jr., extended his investigation by locating the Monte Carlo automobile which had been observed by Officer Lively as he approached the crime scene. The vehicle, which had been backed into the driveway at the home of Pleasant McMath, defendant's sister, was impounded by law enforcement officers. A search of the vehicle pursuant to a search warrant revealed an empty holster and a spent .38 caliber shell casing.
The day after the shooting incident, defendant surrendered to authorities. In the presence of his retained counsel, defendant gave a taped statement, which after a proper predicate was laid, was introduced into evidence at trial on the merits.
Defendant's taped statement revealed that he observed the victim approach his girlfriend Ruby Ann Kirkland, fondle her breasts and pat her on the buttocks. When defendant asked the victim to cease intimate *580 contact with Ms. Kirkland, the victim vulgarly dismissed defendant's request. As defendant proceeded from the pool area to the dressing room, he was met by a group of four men. The men followed defendant to his car. After warning defendant that "the s___ wasn't over with," the victim ran to his car and reached for a sawed-off shotgun held by one of his associates. In response to the victim's efforts to arm himself, defendant retrieved a .22 caliber gun from his car and fired four shots, three of which were fired into the air and one shot was directed toward the victim. Defendant then ran a few steps to the edge of Pear Street, got into his car and drove away.
Defendant also testified at trial on the merits. His trial testimony differed, in several respects, from the taped statement. In his trial testimony, defendant noted that one of the men who approached him in the dressing room was armed with a knife. In addition, at trial defendant testified that the victim was able to arm himself with the sawed-off shotgun before defendant fired his weapon, which was then described as a .38 caliber snub nose revolver. Defendant denied chasing the victim. Although defendant described intimate contact between the victim and Ms. Kirkland, he stated that he "shot at" the victim because the victim pulled a gun and not because the victim approached Ms. Kirkland. Furthermore, defendant expressly denied possessing a .22 caliber weapon, but, rather, maintained that he retrieved both a .38 caliber and a .32 caliber weapon from under the seat of his car.
Ms. Kirkland's testimony generally corroborated defendant's version of the incident. However, she noted that defendant sat in his Monte Carlo automobile for ten to fifteen minutes following the initial verbal altercation with the victim. She testified that after the victim was handed a sack containing a shotgun, defendant fired one of his two guns, aiming into the air. In addition, defendant did not chase the victim down Pear Street. Rather, defendant drove his automobile, occupied by Ms. Kirkland and various members of her family, away from the parking lot.
The only other significant testimony regarding the incident was that given by Clyde Reed who, although called by the defense, maintained that he was a friend of the victim. Mr. Reed testified that he witnessed the initial encounter between defendant and the victim and that he observed the victim pat Ms. Kirkland on the buttocks. However, he expressly denied seeing the victim with a shotgun in his possession at any time during the incident. Contrary to defendant's assertion that he had not chased the fleeing victim, Mr. Reed maintained that he observed defendant, who was armed with two guns, pursue the victim on foot.
Defendant was charged by grand jury indictment with the second degree murder of Don Lineau, in violation of LSA-R.S. 14:30.1. Defendant pled not guilty and, after a jury trial, was found guilty as charged.[1] The trial court sentenced defendant to life imprisonment without benefit of probation, parole or suspension of sentence. Defendant has appealed, alleging six assignments of error, viz.:
1. The trial court erred by denying defendant's motion for post verdict judgment of acquittal;
2. The jury erred by not requiring the state to prove its case beyond a reasonable doubt;
3. The trial court erred by refusing to grant defendant's motion for new trial;
4. The evidence presented at trial did not justify a conviction since state witness, Charles Thomas, testified that defendant had both a .32 and .38 caliber gun in his possession; and the coroner testified that Lineau was shot by a .22 caliber weapon;
5. The trial court erred by failing to grant defendant's motion for new trial *581 grounded on the fact that Charles Thomas, a state witness, gave false testimony about seeing someone being shot in Germany between 1966 and 1969, during his tour of duty with the United States military; and
6. The trial court erred by not reaching the responsive verdict of manslaughter.

ASSIGNMENTS OF ERRORS NOS. 1, 2, 3 & 4
By means of these assignments of error, defendant contends that the verdict of guilty of second degree murder is not supported by the evidence adduced at trial. Assignment of error number one raises this issue by citing error in the trial court's denial of defense motion for post verdict judgment of acquittal. LSA-C.Cr.P. art. 821. Assignments of error numbers two and four raise the same issue by means of formal assignments of error. Assignment of error number three raises the issue by urging error in the trial court's denial of defendant's motion for new trial grounded on an allegation that the verdict was contrary to the law and the evidence. LSA-C.Cr.P. art. 851(1).[2]
Defendant urges, in brief, that the state failed to prove beyond a reasonable doubt that he fatally wounded Don Lineau. Defendant bases his assertion on the discrepancy between the caliber of firearms Charles Thomas claimed to observe in defendant's possession (a .38 caliber revolver and a .32 caliber revolver) and the caliber of bullet (.22 caliber) recovered from the victim during the autopsy. Defendant reasons that, because of conflicting testimony and the testimony of various defense witnesses that the victim at some point possessed a sawed-off shotgun, the state did not exclude the possibility that someone other than defendant actually fired the fatal.22 caliber shots.
Defendant's argument suggests that the state's case was based solely on circumstantial evidence. To the contrary, the trial testimony of Charles Thomas, corroborated in large part by the testimony of the state's other witnesses, provides direct evidence of defendant's fatal shooting of the victim. Whether the trier of fact chose to believe certain eyewitnesses's testimony depends on a determination of the credibility of the witnesses. That determination is a matter of weight of the evidence, not its sufficiency. State v. Kent, 434 So.2d 1258 (La.App. 1st Cir.1983), writ denied, 440 So.2d 727 (La.1983). The trier of fact remains free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31 (La.App. 1st Cir.1984).
Moreover, a finding that Charles Thomas' conclusion, as to the caliber of weapons he observed, was in error does not undermine the credibility of the facts he observed: that defendant was armed with two handguns; that defendant, alone, pursued the victim as he fled down Pear Street; and that defendant fired his guns at the victim numerous times.
In addition, the trier of fact had the benefit of defendant's initial taped statement. In that statement, defendant volunteered information that he had fired a .22 caliber weapon at the victim. That admission came at a time when any conflicts between the witnesses's reported observations and the forensic findings would have presumably been unavailable to defendant.
After viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found defendant guilty of second degree murder beyond a reasonable doubt. LSA-C.Cr.P. art. 821(B).
*582 For the foregoing reasons, these assignments of error are without merit.

ASSIGNMENT OF ERROR NO. 5
By means of this assignment, defendant contends that the trial court erred in failing to grant his motion for new trial grounded on the allegation that Charles Thomas, a state witness, gave false testimony concerning his military experiences. We disagree.
Initially, we note that, although at the hearing on the motion for new trial defendant urged the trial court to reweigh the evidence, defendant's motion for new trial sought relief based solely on the allegation that the verdict was contrary to the law and the evidence. LSA-C.Cr.P. art. 851(1). The granting or denial of a new trial, grounded on considerations which allow the trial court to reweigh the evidence, are not subject to review by appellate courts. See State v. Bell, 442 So.2d 715 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1244 (La.1984).
Moreover, Charles Thomas' testimony, which revealed that he had seen soldiers killed by gunfire near the Berlin Wall during the period from 1966 to 1969, was only remotely relevant to the instant prosecution. The disputed testimony was elicited during cross-examination whereby defense counsel apparently sought to test Mr. Thomas' knowledge of weapons and victim response to gunshot wounds. The trier of fact remained free to accept or reject, in whole or in part, that witness's testimony and evaluate the impact of historical inaccuracy, if any, that it might have perceived.
Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 6
Defendant also contends that the evidence was insufficient to support a conviction of second degree murder and that the evidence, at best, supports the responsive verdict of manslaughter.
In pertinent part, LSA-R.S. 14:30.1 defines second degree murder as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." LSA-R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
Specific intent is a state of mind which need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Boyer, 406 So.2d 143 (La.1981).
LSA-R.S. 14:31 provides in pertinent part:
Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
The existence of "sudden passion" and "heat of blood" are not elements of the offense, but rather are factors in the nature of mitigating circumstances which may reduce the grade of homicide. State v. Tompkins, 403 So.2d 644 (La.1981). Having found the elements of second degree murder, the jury then had to determine whether the circumstances indicated that the crime was actually manslaughter. State v. Rayford, 476 So.2d 961 (La.App. 1st Cir.1985). Because the question of provocation is one of fact, the jury must determine whether the offender's blood had actually cooled or whether the average person's blood would have cooled at the time the offense was committed. State v. Rayford, supra.
*583 Thus, the issue remaining is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have concluded that these mitigating circumstances were not present when the defendant killed Don Lineau.
Because the question of provocation, including whether the offender's blood had actually cooled or whether the average person's blood would have cooled, is one of fact, it is for the jury to determine. See State v. Rayford, supra.
In the instant case, the actions of defendant and the victim were described in detail by various individuals who were present at the public swimming pool during the afternoon in question. The verbal exchanges between defendant and the victim were apparently limited to a brief argument over the victim's advances toward Ruby Ann Kirkland. However, defendant maintained that he fired at the victim because the victim pulled a gun and not because of the victim's advances toward his girlfriend. None of the state's witnesses saw the victim with a weapon. Furthermore, it is undisputed that the victim fled immediately after defendant began firing. In addition, defendant actively pursued the victim over a considerable distance.
From these circumstances, we conclude that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have concluded that, even assuming the victim's advances toward defendant's girlfriend suggested some provocation, defendant's blood had actually cooled or that an average person's blood would have cooled prior to the time defendant shot and killed Lineau. We are convinced that a rational trier of fact could have concluded beyond a reasonable doubt that defendant was guilty of the second degree murder of Lineau and that the offense did not constitute manslaughter. See State v. Smith, 490 So.2d 365 (La.App. 1st Cir.1986); see also State v. Booker, 444 So.2d 238 (La.App. 1st Cir.1983), writ denied, 446 So.2d 1227 (La.1984).
For the above reasons, this assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Defendant's first trial on the merits ended in a mistrial when the jury was unable to agree upon a verdict. See LSA-C.Cr.P. art. 775.
[2] We note that only the weight of the evidence, and not the legal insufficiency of the evidence, can be reviewed by the trial court in a motion for new trial under LSA-C.Cr.P. article 851. State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983). If the trial court finds the evidence legally insufficient, it must do so under LSA-C.Cr.P. article 821. However, the issue of sufficiency of evidence has been properly presented for review under assignment of error number one and will be addressed.