593 So.2d 1356 (1992)
STATE of Louisiana
v.
Gerald Arthur BOSWORTH.
No. 90-KA-0715.
Court of Appeal of Louisiana, Fourth Circuit.
January 30, 1992.
Rehearing Denied March 18, 1992.
*1357 Mark D. Rhodes, Asst. Dist. Atty., Houma, for plaintiff/appellee.
Herbert V. Larson, Jr., New Orleans, for defendant/appellant.
Before CIACCIO, J., GULOTTA and HUFFT, JJ. Pro Tem.
PRESTON H. HUFFT, Judge Pro Tem.
Defendant, Gerald Bosworth, appeals his convictions of second degree murder and manslaughter. On October 11, 1985 the defendant was charged with two counts of first degree murder, violations of L.S.A.-R.S. 14:30, in the 32rd Judicial District Court for the Parish of Terrebonne. Venue was changed to the Criminal District Court for the Parish of Orleans on February 4, 1987. The defendant was tried by jury in Orleans Parish on November 9-12, 1987. The jury was unable to reach a verdict, and a mistrial was declared.
On December 3, 1987 the State amended the indictment to charge the defendant with two counts of second degree murder, violations of L.S.A.-R.S. 14:30.1. The defendant pled not guilty to the charges and was tried by a jury on April 11-15, and 18, 1988. The jury found the defendant guilty as charged on count 1 and guilty of manslaughter on count 2. The defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence with credit for time served and court costs waived on count 1 and to twenty-one years at hard labor with credit for time served and court costs waived on count 2, the two sentences to run concurrently.
Defendant, Gerald Bosworth, was tried and convicted for the murders of David Thomas and Joey Griffin, known partners in drug dealing. The State argued that Bosworth killed Thomas and Griffin for money.
Sometime after 10:00 p.m. on Wednesday, September 11, 1985, David Thomas was murdered at his home in Houma, Louisiana. He was shot twice with a .32 caliber weapon, once in the forehead, between the eyes and once in the right chest. Joey Griffin was killed at his residence in Gray, Louisiana sometime between Wednesday evening (September 11, 1985), and Thursday morning (September 12, 1985). Joey Griffin was shot four times with a .32 caliber weapon, stabbed four times, struck in the head with a blunt object and had a "pecking wound", as in an ice pick, to the back of his neck.
Joey Griffin was found dead in his home on Friday, September 13, 1985. David Thomas was found dead on Sunday, September 15, 1985. Neither of the victims' homes was burglarized. In fact, there was no evidence of forced entry to either residence.
*1358 The State contended at trial that Gerald Bosworth killed both men. Bosworth was a close friend of David Thomas and was Thomas' attorney. Bosworth also knew Griffin. Testimony at trial indicated that Bosworth owed Thomas money. The State theorized that Bosworth went to Thomas to borrow more money and when Thomas refused, Bosworth killed him. The State further theorized that Bosworth subsequently killed Griffin.
To prove that the killings were accomplished by the same person, the State offered proof that the same gun was used to shoot both men. Additionally, four telephone calls were made from Thomas' house to Griffin's house between 5:23 a.m. and 5:28 a.m. on Thursday, September 12, 1985, after Thomas was dead and before Griffin was killed.
To identify Bosworth as the killer, the State relied upon a pair of eye glasses belonging to Bosworth that were found at Griffin's house and some human hair found in Griffin's hand after he died that allegedly matched the defendant's hair. The State also relied upon a telephone call that Bosworth allegedly made to Paula Downer in Houma, Louisiana on Wednesday night, September 11, 1985 in which he sounded frantic and tried to borrow a car from her to go from Houma back to Baton Rouge, Louisiana, where he lived.
Bosworth contended that he was not the killer. He argued that he was home in Baton Rouge on the night of the killings, and that the murders had been committed by Mexican drug dealers, with whom the victims had been doing business shortly before the murders.
To refute defendant's argument that the murders had been committed by drug dealers, the State produced Richard Garcia as an expert in retaliatory killings by Mexican drug dealers. Garcia testified that all Mexicans involved in drug sales were members of either the Texas Syndicate or the Mexican Mafia and that all drug-related killings by Mexicans were accomplished by either the Texas Syndicate or the Mexican Mafia. He also testified that, if the Mexican Mafia was responsible for the killing, the victim would be shot in the head several times with a large caliber weapon, and, if the Texas Syndicate was responsible for the killing, the victim would be disemboweled.
Mr. Garcia testified further that if a person had a drop of Mexican blood in him and that person killed in retaliation over a drug deal, the killing would be accomplished with a large caliber weapon or by disembowelment. He further stated that there were no differences among Mexicans on this issue.
On appeal, defendant argues that the trial court erred in allowing Richard Garcia to testify as an expert in Mexican retaliatory killings.[1] Defendant argues that Garcia's qualifications were lacking, that his opinions had no scientific basis and that his opinions were directed to the ultimate issue of defendant's guilt.
The trial judge held a hearing in his chambers to determine whether to qualify Garcia as an expert. During this hearing, Garcia was questioned on his qualifications and general theories. Garcia, a police officer in Houston, Texas, testified that he had been a policeman with the Houston Police Department for fourteen years. He went to college at Texas A & M, but was ten hours short of receiving a degree in criminal justice. For nine years he served in the Narcotics Division of the Houston Police Department, where he was involved in over 1,000 narcotics investigations targeted at Mexican drug dealers. For the last three years, he has been assigned to the Chicano Squad, responsible for investigating murders that deal with Hispanics. He had *1359 investigated 90 to 100 murders committed by Mexicans in the last three years arising out of double crosses in drug deals.
Garcia has taken two courses in organized crime and prison gang violence. The first course focused on the operation of the Mexican Mafia in prison. The second course focused upon how Mexicans continue their Mafia-related activities after they are released from jail.
He had also taught classes at the Fort Mims County Sheriff's Department and the Criminal Law Enforcement Intelligence Unit in Corpus Christi regarding drug-related murders by Mexicans. He also taught at the Houston Police Academy and at Alvin Community College, but he did not specify what he had taught. He also allegedly wrote a training memorandum on drug-related murders by Mexicans to assist the Austin Police form a Hispanic Crime Unit modeled after the one in Houston. However, when the defendant asked for a copy of the memorandum, the State was unable to produce it.
Garcia testified that a "Mexican" for purposes of his opinion was any person with any percentage of Mexican blood in him. He stated that every Mexican in the United States who dealt drugs was connected to either the Mexican Mafia or the Texas Syndicate. Garcia explained that the Mexican Mafia and Texas Syndicate are rival gangs of "drug families" that have organized systems for bringing drugs from Mexico into the United States. He further stated that, based upon his experience, all retaliatory drug-related murders committed by Mexicans affiliated with the Texas Syndicate are accomplished by disembowelment. All murders by Mexicans affiliated with the Mexican Mafia were accomplished by shooting the victim in the head with a large caliber weapon.
Garcia further testified that there were other "objective criteria" he looked for to tell if a murder was a drug-related murder committed by a Mexican. These were (1) handcuff marks on the victim's wrists or ankles; (2) the last person the victim called before he was killed; (3) tape around the victim's mouth; (4) tape around the victim's wrists; and (5) baggies (used to hold drugs) with drug residue in them. He noted that drugs were not left at the scene.
He did admit that the victim was not always handcuffed and that tape was not always placed around his mouth in a drug-related murder by a Mexican. However, in every such murder baggies with drug residue (but no drugs) were found. In his opinion, no Mexican who sold drugs and who killed in retaliation would, for any reason, leave any significant quantity of drugs behind him.
Garcia also admitted that he had never been qualified as an expert witness, and that his opinion was based upon a combination of experience and intuition.
After hearing this testimony, the trial court recognized Garcia as an expert "in the investigation of suspected killings of persons suspected of being involved in illicit drug activity ... including but not limited to Mexicans." The trial judge ruled that he would allow Garcia to testify regarding the characteristics of killings of Mexicans in retaliation for illicit drug activity. However, the trial judge ruled that he would not allow Garcia to "respond to any questions by the State and offer an opinion as to whether or not either or both of these men were killed by Mexicans" as that is a question of fact and reserved for the jury. Garcia was then brought before the jury to testify. After answering questions regarding his qualifications, the trial court recognized Garcia as an expert. The trial court then gave the jury the general cautionary instruction concerning their discretion in accepting or rejecting the testimony of expert witnesses.
Garcia then reiterated his prior testimony given in chambers regarding the characteristics of drug-related killings by Mexicans. In his opinion, if a person had a drop of Mexican blood in him and that person killed in retaliation over a drug deal, the *1360 killing would be accomplished with a large caliber weapon or by disembowelment. He said that there were no differences among Mexicans on this issue. He reiterated that these two methods were in the Mexican culture. It was his opinion that every Mexican who was ripped off selling drugs was a potential killer who would use a large caliber weapon or would disembowel the victim.
Garcia further stated that usually two or three Mexicans, each armed, were involved in accomplishing these types of killings and that it would be unusual if only one of them was armed. He said, that, after the victim was killed, it was customary to wrap the body in a blanket and take it to a field and burn it. He said that mutilation via "overkill" and the burning of the body were trademarks of this type of killing.
He also said that if money was withheld from Mexicans in a drug deal and the Mexicans were looking for their money, the Mexicans would use torture as a means to obtain the money. He further testified that he had never seen the victim of a drug-related killing by a Mexican pursued through four or five rooms in an attempt to kill him.
Garcia also testified that no person who had a drop of Mexican blood in him regardless of the quantity of drugs he sold would leave any drugs at the scene of a killing over a drug deal which had gone sour.
Generally, opinion testimony is prohibited. Cf. L.S.A.-R.S. 15:463. However, an exception to this prohibition exists for expert testimony. L.S.A.-R.S. 15:464 provides that
"On questions involving a knowledge obtained only by means of a special training or experience the opinion of persons having such special knowledge are admissible as expert witnesses."
Several factors must be considered in determining whether expert testimony should be admitted. State v. Wheeler, 416 So.2d 78 (La.1982). These factors include (1) the degree of concreteness of description or the difference in nearness or remoteness of inference; (2) the purpose for which the testimony is to be admitted; and (3) the potential for its classification as expert testimony. State v. Montana, 421 So.2d 895 (La.1982).
In order for testimony to be classified as expert testimony,
"(a) the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond the understanding of the average layman; and (b) the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier of fact in his search for truth. Montana, supra at 899.
Expert testimony should be admitted, for the purpose of giving the jurors a basis of knowledge and/or background information on a subject, based upon the expert's specialized knowledge or experience. An expert witness may not testify "beyond the scope of [his] background knowledge ..." State v. Lard, 459 So.2d 1189 (La.App. 4th Cir.1984). Further, expert testimony should not be admitted if it relates to a matter within the jury's understanding and would thus be of no aid to the jury. Wheeler, supra; State v. Gray, 533 So.2d 1242 (La.App. 4th Cir.1988).
An expert opinion may not be rendered on the ultimate fact of the defendant's guilt. Wheeler, supra. By rendering such an opinion, the expert usurps the jury's function as the ultimate fact finder. Montana, supra.
In Wheeler, Montana, and State v. White, 450 So.2d 648 (La.1984), the defendant was convicted of possession with intent to distribute drugs. In each case, a police officer who had been qualified and accepted as an expert in narcotic transactions was presented with a hypothetical situation which was identical to the facts of the case. The police officer, in each case, then gave his opinion, based upon those *1361 facts, that the defendant intended to distribute the drugs, as opposed to merely possessing them.
The Louisiana Supreme Court reversed each conviction finding that the expert opinion of the officer that the defendant possessed the intent to distribute was improperly admitted because it constituted an opinion concerning an ultimate fact to be determined by the jury. Thus, the expert witness usurped the jury's role as the ultimate factfinder.
Another panel of this Court in State v. Dabney, 452 So.2d 775 (La.App. 4th Cir. 1984), held that the trial court committed reversible error to allow a police "expert" to give an opinion in response to a hypothetical question identical to the facts of the case that the defendant intended to distribute pentazocine.
Serious questions also exist as to whether expert testimony should be admitted for the purpose of demonstrating the criminal characteristics of various racial groups. In U.S. v. Doe, 903 F.2d 16 (D.C.Cir.1990), the defendant, a Jamaican, was convicted of possession of cocaine and crack with intent to distribute. At trial, a detective gave expert testimony for the prosecution regarding the modus operandi of Jamaican drug dealers. He testified that Jamaicans had taken over the local drug traffic, thereby suggesting that the defendant was guilty because he was Jamaican. The appellate court reversed the conviction finding that the comment was not relevant to the issues presented. It noted that courts must not "treat lightly the risk that racial bias may influence a jury's verdict in a criminal case" and that "distinctions based upon ancestry are as odious and suspect as those predicated on race." U.S. v. Doe, supra at 21-22.
In this case, the State offered the expert testimony of Richard Garcia to disprove one of the defendant's hypotheses of innocence, that is, that the victims were killed by Mexican drug dealers. The issue of whether or not Mexican drug dealers could have killed the victims instead of the defendant was closely intertwined with the issue of defendant's guilt or innocence. If the jury believed that Mexican drug dealers killed the victims instead of the defendant obviously the defendant would not be found guilty.
The opinion offered was, thus, close "to the hub" of the issue of defendant's guilt or innocence. Under the first factor of the test enunciated in State v. Montana, supra, the opinion offered should have been based upon more concrete facts than if it had been offered on a less central issue.
The expert opinion elicited in this case from Mr. Garcia could hardly be said to be "concrete." Garcia made sweeping generalizations regarding all Mexican drug dealers and the manner in which they kill based upon his own limited experience with drug-related murders by Mexican drug dealers in Houston, Texas. He did not explain how his experience provided an adequate basis for making these generalizations, nor did he offer any scientific or statistical basis for his conclusions. Thus, the first factor, requiring that opinions close to the hub of the issue be "concrete," was not met.
Further, Garcia's opinion testimony should not have been admitted because it constituted testimony on the ultimate fact of the defendant's guilt or innocence which is prohibited under State v. Wheeler, supra, and State v. Montana, supra. The subject matter on which Garcia testified was directly related to the defendant's guilt or innocence. If the jury believed that Mexican drug dealers killed the victims, the defendant would have been found innocent.
The trial judge did prohibit the State from presenting a hypothetical question to Garcia with facts identical to the facts of the case and asking Garcia whether, in his opinion, Mexican drug dealers killed the victims. Thus, the trial judge technically complied with Wheeler and Montana, which specifically prohibited the elicitation *1362 of an expert opinion on the defendant's guilt or innocence by presenting a hypothetical situation which mirrored the facts of the case. However, given the unequivocal nature of Garcia's testimony and the sweeping, absolute conclusions he made, it was clear that, in his opinion, a Mexican drug dealer did not kill the victims since neither victim was shot several times in the head with a large caliber weapon or disemboweled and because drugs were found at the scene. Garcia's testimony constituted prohibited testimony on the ultimate issue of the defendant's guilt or innocence and thereby usurped the function of the jury.
Additionally, Garcia attempted to disprove the defendant's theory that Mexican drug dealers committed the killing through the use of "criminal characteristic" testimony which, as stated above, is suspect. Garcia made several grossly generalized statements: (1) that a person was Mexican if he had one drop of Mexican blood in him; (2) that all Mexican drug dealers were members of the Mexican Mafia or the Texas Syndicate; (3) that all members of the Mexican Mafia performed retaliatory drug-related killings by shooting the victim in the head several times with a large caliber weapon; (4) that all members of the Texas Syndicate performed retaliatory drug-related killings by disembowelment; and (5) that no Mexican drug dealer would ever leave any drugs at the scene of a retaliatory drug-related killing. Allowing this type of testimony to be introduced provides a precedent for the introduction of all sorts of racially-motivated "expert" testimony.
Given that Garcia's expert testimony goes to the ultimate fact of the defendant's guilt or innocence, and includes "criminal characteristic" testimony, we must find that his testimony is suspect.
The third factor of the Wheeler and Montana test, the potential for the classification of the testimony as expert testimony, involves a consideration of whether the subject involved is so related to a science, business or profession as to be beyond the understanding of the average juror and whether the witness has sufficient skill in the field so that his opinion will aid the jury in its search for the truth.
It is conceivable that a data base could be compiled which would reflect characteristics of retaliatory drug-related murders by Mexican and that the average juror would be unaware of them. However, Garcia certainly did not possess the qualifications to render such an opinion.
The trial court is granted discretion in determining whether a party qualifies as an expert. State v. Boyer, 406 So.2d 143 (La.1981). Expert testimony may be based upon experience. State v. Catchings, 440 So.2d 153 (La.App. 4th Cir. 1983).
Garcia's alleged expertise was based primarily upon his experience as a police officer in investigating retaliatory killings by Mexican drug dealers in Houston, Texas. Thus, the question is whether Garcia's experience qualified him to render an opinion on all retaliatory killings by Mexican drug dealers. Garcia's experience was based primarily upon the investigation of 90 to 100 retaliatory drug-related murders by Mexicans that occurred in Houston, Texas. His experience did not include the investigation of this type of murder outside of Texas. His experience provided no basis for his gross generalization that all Mexicans were members of the Texas Syndicate or the Mexican Mafia, and that all members of these organizations would kill by disembowelment or shooting the victim with a large caliber weapon in the head.
The courses that Garcia had taken dealt with how members of the Mexican Mafia carried on their illegal activities in jail and upon release. These courses do not provide a factual basis for other generalized opinions expressed by Garcia.
The only other potential basis for the opinions rendered by Garcia was the networking system in which he participated. However, all that Garcia indicated was that he reported the Mexican murders he investigated *1363 to a central agency. He did not indicate that he based his opinion upon information from that agency regarding Mexican retaliatory murders committed by Mexican drug dealers. Garcia acknowledged that his opinions were not based upon a scientific data base, but solely upon his own experience.
A review of Garcia's qualifications reveals that he lacked the qualifications to testify as an expert on retaliatory drug-related killings by all Mexican drug dealers. Having found that Garcia was not qualified to render an expert opinion on the characteristics of retaliatory killing by all Mexican drug dealers, this Court must now determine whether this error warrants reversal.
As the Louisiana Supreme Court stated in Wheeler, "[a]s the subject matter of the opinion approaches the hub of the issue, the risk of prejudice and hence reversible error consequently increases." Wheeler, supra, at 82. The risk of prejudice is particularly high when the expert witness giving the opinion is a police officer whose opinion the jurors would give great confidence and respect. Wheeler, supra. The erroneous admission of expert testimony is reversible error if there is a reasonable possibility that the errors contributed to the conviction. Wheeler, supra; State v. Dabney, 452 So.2d 775 (La. App. 4th Cir.1984).
In the present case, the expert testimony was offered by a police officer to disprove the defendant's hypothesis of innocence that the victims were killed by Mexican drug dealers instead of the defendant. The testimony was thus rendered on a crucial issue and close to the hub of the issue of the defendant's guilt or innocence. The testimony was not "concrete," but involved generalizations based upon insufficient data. Further, Mr. Garcia's testimony included testimony on the ultimate issue of the defendant's guilt or innocence, which is prohibited. It also involved "criminal characteristic" testimony, which is suspect. The testimony was also rendered by a police officer in whom the jury tends to place great confidence. Additionally, there is a reasonable possibility that the introduction of this testimony contributed to the verdict. Mr. Garcia's testimony was not offered at the first trial which resulted in a hung jury.
These facts and the almost certain likelihood that the erroneous admission of this testimony was prejudicial to the defendant are not outweighed by the cautionary instruction given by the trial judge regarding the testimony. Under these circumstances, the introduction of this testimony constitutes reversible error.
Accordingly, for the foregoing reasons, defendant's convictions and sentences are hereby reversed and this matter is remanded to the trial court for a new trial on the merits.
REVERSED AND REMANDED.
GULOTTA, J., dissents with written reasons.
GULOTTA, Judge, dissenting with written reasons.
I respectfully dissent.
An important aspect of this case is whether the trial judge erred in permitting into evidence the expert testimony of Richard Garcia, an expert in retaliatory killings by Mexican drug dealers. This evidence was put on by the State in anticipation of the defense to be offered by the defendant. I find no error in the trial court's ruling permitting the jury to hear that evidence. It is clear that trial courts are to be permitted a great deal of deference by appellate courts regarding the admissibility of expert evidence. In the context of this circumstantial evidence case, I cannot say the trial judge abused its broad discretion in recognizing the field of competence, as well as the competence of the witness or the admissibility of that evidence. State v. Wheeler, 416 So.2d 78 (La.1982); State v. Boyer, 406 So.2d 143 (La.1981). Further, I am of the opinion that the cautionary instruction given by the trial judge to the jury regarding Garcia's testimony was appropriate and satisfactory. That instruction was as follows:
"The court cautions the jury as with this witness and any other witness that has been recognized by the court as an expert *1364 in a particular field that the jury is under no requirement to accept any witness as an expert merely because the court recognizes that person as an expert. The court further instructs the jury that the court's ruling as to whether the court recognizes a person as an expert or not is merely a procedural vehicle that allows the attorneys to ask certain types of questions of a witness that otherwise would not be permitted unless that witness was in fact an expert. You are totally free to disregard the testimony or believe the testimony, whichever is your choice, in whole or in part of this witness or any other witness just as you see fit based on your own evaluation of what that person testifies to. You should not in any way permit the fact that I have recognized him as an expert to enter into your determination as to whether or not you believe any questions may be asked."
I disagree further that Garcia's opinion testimony constituted testimony on the ultimate fact of the defendant's guilt or innocence.
Based on the above, I would affirm the conviction.
NOTES
[1] Defendant assigned three specifications of error on appeal: (1) the insufficiency of the evidence; (2) the improper use of an unqualified "expert" witness and (3) denial of a new trial. Because we conclude that the trial court erred in allowing Mr. Garcia's testimony into evidence and reverse on that assignment of error, we pretermit any discussion of the other specifications of error.