454 So.2d 220 (1984)
STATE of Louisiana, Plaintiff-Appellee,
v.
Sena Mae Cruse Whitehead PORTER and Russell Porter, Defendants-Appellants.
No. CR83-683.
Court of Appeal of Louisiana, Third Circuit.
June 27, 1984.
Writ Denied September 28, 1984.
*221 Patrick L. Durusau, Jena, for defendants-appellants.
Dan B. Cornett, Asst. Dist. Atty., Norris Dale Jackson, Jena, for plaintiff-appellee.
Before CUTRER, DOUCET and YELVERTON, JJ.
CUTRER, Judge.
The defendants, Russell and Sena Mae Porter, husband and wife, were indicted by the LaSalle Parish grand jury on one count of attempted arson with intent to defraud (LSA-R.S. 14:53 and 14:27) and on two counts of arson with intent to defraud (LSA-R.S. 14:53). These indictments were the result of three separate incidents, the final one culminating in the partial destruction of the defendants' insured house in Tullos. After pleading not guilty to those charges, the defendants were jointly tried before a six person jury and each was convicted on all three counts. Motions for post verdict judgments of acquittal and for a new trial were denied by the trial court.
The defendants were sentenced as follows:
(1) Mr. Porter:[1] On the two counts of arson with intent to defraud, he was sentenced to serve thirty months imprisonment in the custody of the Louisiana Department of Corrections on each count. Further, he was ordered to pay a fine of $2,500.00 for one of those convictions plus the costs of his prosecution. For the conviction of attempted arson with intent to defraud, he was sentenced to ten months imprisonment and to the payment of a $500.00 fine. All three of the prison terms were ordered to be served concurrently;
(2) Mrs. Porter: On the two counts of arson with the intent to defraud, she was sentenced to the payment of a single fine of $1,500.00, to the payment of costs and to serve eighteen months at hard labor with the Department of Corrections on each count. The attempt conviction resulted in a sentence of nine months imprisonment and a fine of $500.00. All three prison terms (ordered to be served concurrently) were suspended, and she was placed on *222 four years supervised probation with special conditions imposed.
The defendants have appealed their convictions, raising various assignments of error, all of which deal with the sufficiency of the evidence upon which they were convicted.

FACTS
The property forming the basis of the defendants' convictions was a frame house in Tullos, Louisiana. It was owned by Mrs. Porter as a result of her earlier marriage to Dub Whitehead who died in 1977. The defendants were married in 1979 and lived together in the Tullos house. The next door neighbors of the defendants were Sandy Whitehead (Mrs. Porter's son) and his wife, Nancy, on one side and Lavita Fife and her son, Darwin, on the other side.
In August 1981, the defendants moved to Broussard, Louisiana, where Mr. Porter was hired as a maintenance supervisor; they did, however, make periodic weekend trips to Tullos where they would stay in their house. Although the house was vacant other than during the Porters' visit, all of the utilities remained connected. On the weekend of Sunday, January 31, 1982, the defendants were present in Tullos on one of their visits. According to Mr. Porter, he received a telephone call on that Sunday, near the noon hour, from his employer telling him that he was needed at a distant job site. The Porters left shortly after receiving the telephone call and put a note on the Whiteheads' door telling of their departure. Apparently no one saw the defendants leave; Lavita Fife stated that they were gone when she returned from church at 12:30 P.M.
Earlier that morning and prior to their departure, the defendants spoke with Nancy Whitehead concerning some dishes Mrs. Porter was going to give her. Nancy was to pick up those dishes from the defendants' house that Sunday afternoon. (Sandy Whitehead had a key to the house.) The Whiteheads returned to their home from church at approximately 1:00 P.M. that afternoon and Sandy Whitehead, noticing that a light had been left on at the Porter house, went over to extinguish it.
When Sandy entered the house with the use of his key, he detected the heavy odor associated with natural gas and he began yelling for his wife, Nancy, and their neighbor, Lavita Fife. Both Nancy and Lavita responded to Sandy's calls and each smelled the heavy fumes. Lavita testified that it caused her eyes to water. Sandy determined the source of the gas to be a gas line in the hallway coming up through the floor. That line ordinarily serviced a gas heater but the heater was not connected. The cap of the gas pipe had been unscrewed and was left merely seated on the pipe. Lavita stated that the cap was moving as the gas escaped from under it.
Sandy, Nancy and Lavita testified that several elements on the electric stove, including the oven (with its door open), were on and that all were red hot. Sandy screwed the gas cap back on with his hands and turned the gas off at the meter. Apparently, the defendants, who did not return to Tullos until Friday, February 26, 1982, were not told of the discovery by the Whiteheads and Lavita.
Testimony at trial indicated that the defendants used the electric stove and oven for heating the kitchen. Mr. Porter said that those appliances were left on that Sunday to keep the house warm for Nancy who was to later remove the dishes previously promised her. The defendants both testified but gave no explanation for the removed gas cap. The incident on January 31st was the basis for the conviction of attempted arson with intent to defraud.
On Friday, February 26, 1982, the defendants returned to Tullos enroute to attending a criminal trial in Jena, wherein Sandy was the defendant. Prior to attending the trial that afternoon, the defendants (who were traveling in a motor home) stopped at their house in Tullos to make a long distance telephone call. Their nine-year-old daughter, Stacy (the natural daughter of Mr. Porter but adopted daughter of Mrs. Porter), remained in the vehicle *223 while her parents were inside. Darwin Fife had received oral surgery earlier that day and he was resting at the Fife home next door when he saw the defendants arrive at approximately 1:00 P.M. According to Darwin, the defendants were in their house only five to ten minutes before they left, and only minutes (approximately five to ten) after they departed, Darwin noticed smoke coming from the Porter house. Darwin's testimony was corroborated by Lavita's, the latter being the one who summoned the fire department.
Initially, the members of the Tullos Volunteer Fire Department broke the windows to a bedroom from which most of the smoke was issuing through a window air conditioning unit. The bedroom was erroneously doused with water before it was discovered that the fire was at the other end of the house and consisted of a bag of burning trash against the den wall. The door was kicked open, the trash dragged outside, and the fire was extinguished, although some charring and scorching to the walls resulted. A fireman at the scene testified that the fire was completely extinguished. Further, he inspected the house to make sure that there were no other fires.
Phil Bryant, an insurance investigator accepted by the trial judge as an expert in the field of determining fire origins, testified that the fire was the result of a human element, such as a match. Bryant could not determine whether the fire was started intentionally or accidentally. He did state that the fire was not started electrically or spontaneously. This occurrence on February 26th (we refer to this as the first fire) resulted in the defendants' convictions on one count each of arson with intent to defraud.
At approximately 4:00 P.M., the Porters returned to their house and were told by Darwin what had happened after they left. The defendants stayed long enough for Mr. Porter to cover the broken bedroom window with a piece of wood, after which they left. According to Mr. Porter, he had a pressing job requirement which needed his attention in Texas. The Porters' daughter again stayed in the motor home during this visit.
Lavita, from her home, observed the defendants' departure and she said that she only saw Mrs. Porter leave the house, but she was walking "real fast." The defendants then left immediately after backing quickly from their driveway. Approximately three to five minutes later, Lavita saw smoke pouring out of the house, whereupon she again summoned the fire department. Before the fire was extinguished extensive damage was incurred to the house.
The insurance investigator, Bryant, testified that the fire was caused by the spreading of a fire accelerant on the hallway, kitchen and bedroom floors. This determination was reached because of the burn patterns on those floors and along the lower baseboards.
Charles Newsom, one of the volunteer firemen, testified that he saw a partially burned can, containing floor lacquer, in the hallway following the second fire. After the first fire (at 1:00 P.M.), he had walked through the house and had not seen that can in the hallway or elsewhere. There were other undamaged cans of this same highly flammable lacquer located in a storage building on defendants' property.
Bryant took three floor samples from the hallway and bedroom and a sample from the lacquer can found in the hallway. He had them analyzed by a chemist, Dr. Andrew Armstrong (qualified as an expert chemist at trial). Dr. Armstrong, after extensive scientific testing, determined that all four of the samples contained the same highly volatile and flammable substance generally associated with lacquers. Computer testing rather conclusively matched all four samples. Bryant testified that there was no doubt in his mind that the second fire was intentionally set.
William McBroom, called as a witness by the State, was standing across the road from the Porter house, a distance of 100 to 125 yards, shortly before the second fire. McBroom testified that he had good vision *224 from that distance and that he saw Mr. Porter carrying a can, which appeared to be one used to hold paint thinners. After learning of the fire, McBroom conveyed his observation to a fire marshall several days later.
Both defendants testified at trial. Mr. Porter testified that the container he was carrying into the house, and seen by McBroom, was actually a water container in which he was carrying water to Mrs. Porter to aid her in taking her medication.[2] Mrs. Porter testified that the can of lacquer recovered from the hallway resembled one which had been stored in a bedroom closet for a long time.
The second and final fire was the basis for the other conviction of each defendant for arson with intent to defraud. The Porters denied their involvement in any of the three incidents. Each testified that they were in the other's company during all of the pertinent periods of time concerning the allegedly criminal acts, and that, if one had done something, the other would have seen it.
ASSIGNMENT OF ERROR
The defendants allege that the State provided insufficient evidence of their guilt as to the three convictions received by each. Appellate review exists upon the basis of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This court recently stated in State v. Deville, 451 So.2d 129 (La.App. 3rd Cir.1984), the standard of review applying to this allegation as follows:
"Under the law, we are called upon to review the evidence in the light most favorable to the prosecution; only if we then find that any rational factfinder could not have found that the State proved every element of the crime beyond a reasonable doubt can we supplant the factual findings of the lower court."
In the instant case, because there were no direct witnesses to the actual, allegedly culpable acts by the defendants, the State was required to prove its case with the use of circumstantial evidence. State v. Graham, 422 So.2d 123 (La.1982). Our Supreme Court has stated the rule pertaining to circumstantial evidence thusly:
"Where circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that: `Assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'

"This Court has recognized that R.S. 15:438 is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. State v. Austin, 399 So.2d 158 (La.1981). Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. R.S. 15:438 provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. As we stated in State v. Chism, 436 So.2d 464 (La.1983), La.R.S. 15:438 `may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, [but] it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence."
State v. Wright, 445 So.2d 1198 (La.1984).
The crime of arson with intent to defraud is defined in LSA-R.S. 14:53 thusly:

*225 "Arson with intent to defraud is the setting fire to ... any property, with intent to defraud."
An attempt is defined in LSA-R.S. 14:27(A) as follows:
"A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."
The applicable statutes require that the State prove that one accused of the instant crimes possessed the intent to defraud. Because this is an intent to produce or accomplish some prescribed consequence, it is deemed to be a specific intent. See State v. Fuller, 414 So.2d 306 (La. 1982). An "attempt" is expressly designated as a specific intent crime. LSA-R.S. 14:27(A). A specific criminal intent is defined in R.S. 14:10(1) as being "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed consequences to follow his act or failure to act."
The court in State v. Graham, 420 So.2d 1126 (La.1982), stated the following:
"However, specific intent is a state of mind, and need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Boyer, 406 So.2d 143, 150 (La.1981); State v. McDermitt, 406 So.2d 195 (La.1981); State v. Williams, 383 So.2d 369 (La. 1980); State v. Garner, 241 La. 275, 128 So.2d 655 (La.1961).

* * * * * *
"Specific intent is an ultimate legal conclusion to be resolved by the fact finders. State v. LeCompte, 371 So.2d 239, 243 (La.1979). The defendant was tried by a ... jury of his peers. The jury returned a verdict of guilty as charged. Since the jury is the ultimate trier of fact, they have necessarily reached a conclusion that specific intent was present, along with all of the other elements... We find that this conclusion is within the jury's discretion. The discretion of the jury should be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. State v. McKeever, 407 So.2d 662, 665 (La.1981); and Jackson v. Virginia, supra."
In its determination of the defendants' guilt, the jury had before it all of the evidence which consisted of three separate incidents, the third resulting in a serious fire. The totality of the circumstances as to each conviction included the circumstances regarding the other two convictions.
The incinerated house and its contents were insured by the North Assurance Company of America for a total of $76,500.00. Following the fire, the defendants placed a claim for their loss in the amount of $69,750.00. Mickey Riley, the vice-president and manager of the Tullos branch of the LaSalle State Bank, had loaned money on various occasions to the defendants. Riley testified that he would not have loaned the defendants more than approximately $20,000.00, using their house as security.
Much testimony was elicited by the State and the defense regarding the financial status of the defendants, the latter attempting to establish that no financial needs were present which might necessitate the defendants' entry into the field of arson. From that testimony we note the following:
(1) Mr. Porter had "lost very heavily" in the logging business in 1979;
(2) The defendants had received some past due notices on loans in 1981 from the LaSalle State Bank; and
(3) Various loans with their bank had been consolidated by the defendants into one loan in 1981 of approximately $20,000.00.
Under these circumstances, it is clear that the defendants did possess the specific intent to defraud their insurer, if they committed the incendiary attempt on January 31st and the two separate arsons *226 on February 26th. We, therefore, focus our attention on the circumstantial evidence tending to establish that the defendants were the perpetrators of the three culpable acts.
As the defendants testified that each was privy to the actions of the other, we shall consider their convictions as to each count jointly. For purpose of this review, we shall refer to the conviction for attempted arson with intent to defraud as Count One. Count Two refers to the first fire of February 26, 1982, at approximately 1:00 P.M., consisting of the trash found burning in the defendants' house. Count Three involves the second and final fire, also occurring on February 26th. We will consider each count separately.
COUNT ONE
This conviction for attempted arson with the intent to defraud was the result of the incident on January 31, 1982, wherein it was discovered that, shortly after the defendants left their house, a gas cap had been loosened filling the house with natural gas and that the electric stove and oven were left burning.
The defendants argue in brief that the testimony of Sandy Whitehead, who first noticed the house filled with gas fumes and the red hot stove and oven, is false and should not be accepted as evidence against the defendants. This contention is based on several allegations purporting to affect Sandy's credibility. To this argument we note the following language by our Supreme Court in State v. Trosclair, 443 So.2d 1098 (La.1983):
"The defendant claims, however, that a guilty verdict could not properly be founded upon the testimony of these witnesses as their credibility was destroyed. But it is not our function to assess credibility or reweigh the evidence. Our review for minimal constitutional sufficiency of evidence is a limited one which ends upon our finding that the rational trier-reasonable doubt standard has been satisfied."
Also, see State v. Wright, 410 So.2d 1092 (La.1982), and State v. Klar, 400 So.2d 610 (La.1981). We may not, therefore, find incredible the testimony of a witness, which was obviously found credible by the appropriate factfinder.
The evidence of guilt as to Count One consists of the following: the defendants left their house in Tullos at approximately noon; Sandy had to unlock the house with his key to enter it one hour later; Lavita saw Sandy enter the house and heard his yells for help; Lavita, Sandy and Nancy all detected the gas and the loosened cap with the stove and oven burning; Dr. Armstrong testified that the natural gas would eventually explode under those circumstances; and there were two other incidents later (to be discussed infra) which finally resulted in the house's destruction by fire. The circumstantial evidence when considered in its totality clearly excludes every reasonable hypothesis other than that the defendants attempted to commit an arson with the intent to defraud their insurer.[3]
COUNT TWO
The evidence tending to establish the defendants' guilt as to this incident is summarized as follows: a month earlier an attempted arson had failed; the defendants were seen to drive up to their home on February 26th, and they left a short time later; their young daughter stayed in their vehicle, not entering the house; only minutes later the Fifes saw smoke coming from the Porters' house; it was caused by a trash fire against the inside wooden wall of a room in the house; the firemen had to kick the door open to gain entry; Bryant, an expert in fire origins, testified that the fire did not start spontaneously, that it was not of an electrical origin and that it was started by a human; he could not say whether the fire was started intentionally; and three hours later the house was burned under the circumstances to be capsulized under Count Three.
*227 The defendants failed to present any reasonable hypothesis regarding the ignition of this fire which might exculpate them. The only reasonable hypothesis is that the defendants started the fire and left with the hope that it would destroy their house.
COUNT THREE
The circumstantial evidence establishing the defendants' guilt as to the final fire on February 26th is overwhelming: the defendants were in their house only a short time before leaving at approximately 4:00 P.M.; once again their daughter stayed in their vehicle and did not enter the house; testimony reflected that the first fire earlier that day had been completely extinguished; Mr. Porter was seen carrying a can similar to those containing paint thinner into the house shortly before the fire; Charlie Newsom saw a can of lacquer in the burnt hallway after this fire, and he had not seen this can during his earlier tour of the house following the trash fire; only three to five minutes after the defendants rapidly drove away, the Fifes noted the heavy smoke billowing from the house; and expert testimony from Bryant and Dr. Armstrong conclusively established that the fire was ignited by the lacquer from the can, which had been spread in three rooms of the house.[4]
Under all of these circumstances, there exists no reasonable hypothesis other than that the defendants intentionally committed the arson of their house with the specific intent of defrauding their home insurer.
In summary, the State successfully met its burden at trial of proving the defendants's guilt beyond a reasonable doubt as to all three crimes. As stated earlier, the jury had before it all of the evidence regarding the three incidents of which the defendants were convicted. That evidence established a sequence of criminal events, each evidentially supportive of a conviction on each count. Further, the circumstantial evidence rule requiring that there be no reasonable hypothesis of innocence as to each count has also been satisfied.
For the aforementioned reasons, the defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Mr. Porter had a prior felony record including an armed robbery conviction.
[2] According to Mr. Porter, the water pipes to the house had previously burst because of a freeze and there was no water for this reason.
[3] No other reasonable hypothesis as to who could have loosened the gas cap was presented.
[4] The defendants attempted to establish that the fire could have started in the attic, which had not been examined carefully by fire inspectors. However, Bryant's testimony negated the possibility of the attic being a point of the fire origin.