WALTER J. ROTHSCHILD, Judge.
|20n February 5, 2009, the Jefferson Parish District Attorney’s office charged defendant, Catina P. Brown,[1] by bill of information with access device fraud, in violation of LSA-R.S. 14:70.4. Defendant pled not guilty to the charge , on February 9, 2009. On March 3, 2010, a six person *272 jury found defendant guilty of a lesser charge, access device fraud of at least $300.00 but less than $500.00, and sentencing was set for March 29, 2010.
On March 25, 2010, defendant filed a motion for new trial alleging that the evidence produced at trial did not support the verdict. On March 29, 2010, the trial court denied defendant’s motion for new trial finding that the verdict was amply supported by the evidence. On the same day, the court sentenced defendant to |sthree years at hard labor prohibiting any reduction of the sentence for good time served.
The State then filed a multiple offender bill of information alleging that the defendant was a quadruple felony offender, to which she stipulated. On the same date, the district court vacated the original sentence and sentenced defendant to 20 years without benefit of probation or suspension of sentence, with the first three years to be served without benefit of good time. Defense counsel objected to defendant’s multiple offender sentence and gave the court oral notice of his intention to file a motion for an appeal. Defendant filed a written motion for appeal on March 30, 2010, which was signed by the trial judge on the same day. This appeal follows.

FACTS

Evidence was introduced at trial that Jack Grey, a 90 year-old man, found five unauthorized withdrawals when balancing his checkbook: four were credited to Tyler Brown’s account and one to Catina Brown’s AT & T account. At trial, Janet Grey Ryan, who was living in Houston, Texas, testified that the victim, her uncle, appointed her to have power of attorney over his affairs. Prior to his death in 2009, the victim lived alone at the Atrium, an assisted living facility for the elderly located in Metairie. Mrs. Ryan stated that although she took care of the victim’s affairs, he was mentally alert: he paid his own bills, which included his monthly rent check to the Atrium, and balanced his checkbook every month.
Mrs. Ryan testified that sometime in November of 2008, the victim called her regarding some irregularities in his Capital One Bank statements. After balancing his checkbook, the victim called Mrs. Ryan because he noticed that money was withdrawn from his account without authorization. Shortly after noticing the discrepancies in his bank statement, the victim notified Mrs. Ryan that |4one check was missing out of an unused pack of checks. Mrs. Ryan immediately phoned Capital One, who placed a hold on the account.
The next day, Mrs. Ryan went to Capital One in Houston and closed the victim’s account. Capital One assisted Mrs. Ryan in identifying five unauthorized withdrawals totaling $6,968.00: 1) on October 23, 2008, in the amount of $2000 from Chase E Pay for Tyler Brown; 2) on October 24, 2008, in the amount of $413 from AT & T Care Cellular for Catina Brown; 3) on November 3, 2008, in the amount of $4233.34 from Chase E Pay for Tyler Brown; 4) on November 6, 2008, in the amount of $202.95 from FPB Credit Card for Tyler Brown; and 5) on November 14, 2008, in the amount of $119.59 from FPB Credit Card for Tyler Brown. Additionally, Capital One assisted Mrs. Ryan in completing the necessary paperwork, which consisted of five Statements of Unauthorized ACH Debit Entry forms and an affidavit regarding the fraudulent withdrawals. Capital One further reversed the charges on November 17, 2008.
After executing the affidavit, Mrs. Ryan faxed it, along with all the bank records she had at the time, to the Jefferson Parish Sheriffs Office on November 17, 2008. Subsequently, the victim and Mrs. Ryan met with Detective Wright of the Jefferson *273 Parish Sheriffs Office in reference to the bank withdrawals.
The victim spoke with Detective Wright about the incident, then Mrs. Ryan gave him the information regarding the action taken at the bank, including the names of the people who withdrew the funds.
On cross-examination, Mrs. Ryan testified that the victim was very private about his personal affairs and would not have given anyone else authority to use his account. Mrs. Ryan further testified that the victim kept his checkbooks in his dresser drawer and that she had never given defendant a check from her uncle’s |saccount. In addition, Mrs. Ryan named Tyler and Catina Brown as the people who withdrew the money from the bank.
Marco Demma, Senior Fraud Investigator with Capital One Bank, testified that there were five charges on the victim’s account, which were generated electronically via automated clearing house, or ACH. Mr. Demma identified the same charges Mrs. Ryan identified in her testimony. Mr. Demma could not determine who initiated the charges or whether the charges were accomplished by telephone or through the internet. However, he did indicate that the person originating the transaction would have to know the account number and the routing number at the bottom of the check in order to accomplish such a transaction on an account.
Detective Daniel Wright of the Jefferson Parish Sheriffs Office Economic Crime Unit testified that he was assigned to the victim’s case on November 18, 2008. On November 26, 2008, Detective Wright interviewed the victim, together with Mrs. Ryan, in person. The victim told Detective Wright that he received his bank statement in the mail in the later months of 2008 and noticed some debits, “which he did not do,” on his checking account. Therefore, he notified Mrs. Ryan, who has power of attorney over his personal and financial affairs, and she obtained the Capital One Bank records that listed the unauthorized transactions in his checking account. Mrs. Ryan supplied Detective Wright with all of the bank records, which showed the unauthorized transactions. One of the documents given to Detective Wright named Catina Brown and Tyler Brown, and they became the subjects of his investigation. Detective Wright eventually arrested Tyler Brown and defendant.
Defendant was arrested on December 26, 2008, at the Atrium, where she lived and worked, which was also the victim’s place of residence. Defendant | ¿waived her rights and denied any involvement in the offense. She acknowledged asking the victim whether or not he had a power of attorney because there was no record in the file. She also told Detective Wright that she would pay her bills and her son’s (Tyler Brown) bills online.
Detective Wright stated that defendant was cooperative with the investigation. Defendant voluntarily went online, using Detective Wright’s office computer and pulled up and printed her credit card records from Washington Mutual and Red Dot [sic].[2] Defendant’s bank statement showed that $413 to AT & T was charged to her account on November 20, 2008, which corresponds to one of the unauthorized transactions on the victim’s account. However, when asked about the charge on her account, she didn’t have an answer.
*274 On cross examination, Detective Wright explained that although the transactions were in the names of Tyler Brown and Catina Brown, there was no way for him to tell who made those transactions. Detective Wright further testified that the reversal on the victim’s account was dated November 17, 2008, and defendant repaid AT & T the $418 on November 20, 2008.
Marie Scavo, the executive director at the Atrium, testified that she worked with defendant, whom she hired as the assistant marketer to give tours to the families of potential residents. Then defendant became the Director of Marketing, which consisted of the same duties as the assistant marketer but also included executing the contracts with those who decided to move into the facility. Ms. Scavo stated that defendant often worked at the front desk, where patients would drop off their monthly rent checks.
|7After rent payments were made at the front desk, a copy of the check was returned to the payor, and the check was either placed into a locked wooden box outside of Karen Keller’s (the Business Office Manager) door or, alternatively, slipped under her door. Defendant had a key to Ms. Scavo’s office, which provided defendant unlimited access to personnel files, human resource items, and the keys Ms. Scavo kept in her desk. The keys in Ms. Scavo’s desk provided defendant with access to the accountant’s office. Additionally, Ms. Scavo affirmed that “at one time” her office key also opened the door to Karen Keller’s office.
Ms. Scavo also agreed that Tyler Brown, defendant’s son and co-defendant, had the same access as defendant because he lived with defendant and also worked at the Atrium. Tyler Brown’s work duties mainly consisted of preparing meals, helping in the kitchen or dining room, delivering meals to rooms, and answering the phones. Ms. Scavo testified that at the time of the incident, she asked Tyler Brown what was going on and- he responded: “I don’t know, but I can’t see my mom go back to jail again.” Ms. Scavo also affirmed that it would not be unusual for defendant, as marketing director, to ask a resident for a power of attorney document in order to update his or her medical record.
Ms. Scavo also asserted that she received a letter from defendant. Ms. Scavo was not exactly sure of what the letter said because she only glanced at it. However, she indicated that it seemed to be an apology, which included a request for her to testify “truthfully.” Specifically, defendant requested Ms. Scavo to testify that defendant handled leases and contracts, but that she did not handle checks and did not have access to Jack Grey’s checks, which was not the truth.
Karen Keller, Business Office Manager at the Atrium, testified that she does the billing, collections, and payroll. She also knows defendant and Tyler Brown because they worked at the Atrium.
|sMs. Keller stated that her key ring contained the key to the locked box, where the checks were dropped, and Ms. Scavo’s office key ring contained keys to different locks and doors at the Atrium. Ms. Keller asserted that she had a key to Ms. Scavo’s office and Ms. Scavo a key to her office; therefore, they had access to the same things, except for the locked box that contained the checks. Ms. Keller stated that she collected the rent checks and processed them using a scanner in her office. Defendant would not handle a check unless she was at the front desk and took a payment from a resident. After defendant was arrested, Ms. Keller had the occasion to speak with Tyler Brown, who told her that his mom wanted him to take the “rap for everything that happened,” and that he was going to do so against his own will.
*275 The defense called its only witness, Tyler Brown. Tyler Brown took sole responsibility for the access device fraud on Jack Grey’s account and denied ever having made a statement to Karen Keller regarding taking the “rap” for his mother. Mr. Brown explained that he stole a check from the victim and used it to pay four different bills, including his mother’s AT & T bill. Mr. Brown gained access when he delivered a meal to the victim’s room. The victim instructed Mr. Brown from his recliner to leave the meal on the kitchen counter. Mr. Brown saw victim’s checkbook on the counter and removed a check from the middle back of the book. Defendant further testified that his mother had given him $300 to pay her AT & T bill, but he pocketed the money for drugs and used the victim’s account information to pay the bill online. However, Mr. Brown’s affidavit states that defendant gave him approximately $400 in cash to pay off the AT & T bill.
Tyler Brown admitted that he pled guilty to the felony charge of access device fraud and denied that his mother had any involvement in the offense. After his mother was arrested, he turned himself in to the police without, first speaking to | nhis attorney. Upon being questioned by Detective Wright, Mr. Brown admitted that he committed the offense but did not go into detail or release any statements.
On cross examination, Mr. Brown said that he did not go into detail or release any statements when being questioned by the detectives upon the advice of his attorney. Mr. Brown also denied ever calling the State’s attorney, Mr. Wallace, sometime in November of 2009. Moreover, Mr. Brown denied being in Tennessee in late 2009 as it was a violation of probation. Then, rebuttal witness, Norman Schultz, testified that he retrieved a message that Mr. Brown left for Mr. Wallace on his voicemail on November 30th. Mr. Schultz testified that the call was made from a Tennessee number: 865-228-6120.[3] The message was played in open court: “Mr. Wallace, this is Tyler Brown trying to contact you back again. I’m going to try and call back in 30 minutes. If you get this message any sooner, please contact me at 865-357-5380. Thank you.”
After conclusion of the testimony, the jury deliberated and returned a responsive verdict, convicting defendant of access device fraud in the amount between $300 and $500. After her motion for new trial was denied, defendant filed this timely appeal.

DISCUSSION

Defendant argues on appeal that the evidence was insufficient to uphold the conviction. Defendant further contends that Tyler Brown admitted to the crime, as the sole perpetrator; therefore, no rational trier of fact could have found defendant, Catina Brown, guilty beyond a reasonable doubt.
The State responds that it presented evidence from which the jury could have believed that the defendant persuaded her son to take responsibility for the offense. The State further maintains that the evidence was sufficient to support the | ^conclusion that defendant was guilty of a lesser charge of access device fraud in between $300.00 and $500.00, and that the reasonable findings and inferences permitted by the evidence exclude every reasonable hypothesis of innocence.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is *276 whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kempton, 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. However, this requirement of LSA-R.S. 15:438 does not establish a standard that is separate from the Jackson standard, but instead provides a helpful methodology for determining the existence of reasonable doubt. State v. Lathers, 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884. To support the conclusion 1 iithat the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. Id. (citation omitted).
On appeal, the reviewing court does not determine if another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. Instead, the appellate court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the Jackson standard. State v. Durand, 07-4, p. 8 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753.
Defendant was charged with access device fraud in an amount over $500.00, in violation of LSA-R.S. 14:70.4. However, defendant was convicted of a lesser charge of access device fraud in an amount between $300 and $500.00. LSA-R.S. 14:70.4, reads, in pertinent part, as follows:
Access Device Fraud
A. No person shall without authorization and with the intent to defraud transfer an access device to another person.
B. (1) ‘Access device’ means a person’s social security number, driver’s license number, birth date, mother’s maiden name, checking account numbers, savings account numbers, personal identification numbers, electronic identification numbers, digital signatures, or other means of account access that can be used to obtain anything of value, whether contemporaneously or not.
As such, in order to support a conviction for access device fraud pursuant to LSA-R.S. 14:70.4, the State is required to prove that the defendant, with the intent to defraud, transferred an access device to another person without authorization. In addition, the State is required to prove the value of the misappropriation, since the determination of the severity of the offense and the degree of punishment upon conviction depends upon the value of such. In order to support the instant | |2conviction, the State needed to prove that the value of *277 the misappropriation was in between $300 and $500.
The applicable statute requires that the State prove that defendant possessed the intent to defraud. The intent to defraud element requires specific intent. State v. Sosa, 05-213, p. 7 (La.1/19/06), 921 So.2d 94, 99, and State v. Porter, 454 So.2d 220, 225 (La.App. 3 Cir.1984), writ denied, 457 So.2d 17 (La.1984), cert. denied, 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985). Specific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” LSA-R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances and actions of the accused. State v. Woodhead, 03-1036, pp. 7-8 (La.App. 5 Cir. 1/27/04), 866 So.2d 995, 999, writ denied, 04-598 (La.7/2/04), 877 So.2d 144 and State v. Graham, 420 So.2d 1126, 1127 (La.1982) (citing State v. Boyer, 406 So.2d 143, 150 (La.1981); State v. McDermitt, 406 So.2d 195 (La.1981); State v. Williams, 383 So.2d 369 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981); State v. Garner, 241 La. 275, 128 So.2d 655 (La.1961)). Further, specific intent is an ultimate legal conclusion to be determined by the fact finder and review of correctness of this determination is guided by the Jackson standard. State v. Lecompte, 371 So.2d 239, 243 (La.1979) and Sosa, 05-213 at p. 7, 921 So.2d at 99.
We find that the State presented sufficient evidence for the jury to conclude that the victim’s checking account number was transferred to another person in order to debit money from his account, without his consent, and that the value of the misappropriation was in between $300 and $500. Further, the State presented evidence that defendant colluded with her son to transfer the victim’s checking account number to another person, which resulted in the misappropriation of 1 1smoney from the victim. The State presented its case through the testimonies of Ms. Janet Ryan, the victim’s niece and power of attorney, Marco Demma from Capital One Bank, Detective Daniel Wright, and Marie Scavo and Karen Keller from the Atrium.
The State established that the victim’s checking account number was used to transfer money from his checking account via ACH debit to defendant’s AT & T account, without his consent. The 90-year-old victim, after balancing his checkbook, reported some unauthorized transactions to Janet Ryan, who had power of attorney over his account. The victim also informed Ms. Ryan that a single check was missing from an unused pack of checks. Ms. Ryan reported the unauthorized activity to Capital One Bank, who investigated and assisted the victim in reporting the matter. In total, there were five unauthorized transactions: four transactions which were credited to accounts in the name of Tyler Brown and one, in the amount of $413, which was credited to an AT & T account in the name of Catina Brown.
The defendant does not dispute that Jack Grey was the victim of access device fraud; she only contends that she had no knowledge or involvement in the crime. However, the record demonstrates that the State has presented evidence of defendant’s involvement.
Marie Scavo testified that, at the time of the incident, she talked to Tyler Brown who indicated to her that he “didn’t know what was going on but he couldn’t see his mom go back to jail again.” She also testified that she received a letter from defendant, which seemed to be an apology and a request for her to testify that defendant did not have access to the victim’s checking account information, which was *278 untrue. Additionally, Karen Keller testified that she spoke to Tyler Brown after defendant was arrested and he communicated to her that his |14mom, the defendant, wanted him to take the “rap for everything that happened,” and that he intended to take responsibility.
The State further presented evidence that the victim had five unauthorized withdrawals from his checking account, one being credited to an AT & T account in the defendant’s name and further that defendant had access to the victim’s account information. Detective Wright testified that defendant stated that she pays her bills online, which is inconsistent with Tyler Brown’s testimony contending that his mom gave him cash to pay the phone bill. Detective Wright testified that the bank reversed the charges on November 17, 2008 and defendant repaid her $413 AT & T bill on November 20, 2008. When the detective asked her about the charge, she didn’t have an answer.
Conversely, defendant presented the testimony of her son Tyler Brown, who testified that he pled guilty to access device fraud and denied that his mother had any involvement in the crime. He admitted to stealing a check, which was consistent with Ms. Ryan’s testimony that victim informed her that a check was missing. Tyler Brown also denied ever talking to Karen Keller in reference to taking the blame for his mother. Tyler Brown further testified that defendant gave him $300 in cash to pay her phone bill, which he used for drugs instead. He then paid her phone bill using the victim’s checking account information that he stole out of his room from a checkbook. However, defendant presented a sworn affidavit, in which Mr. Brown admitted that his mother gave him $400 in cash to pay the bill, which is inconsistent with his testimony where he asserted that the amount was $300. Further, Tyler Brown testified that he attempted to use victim’s account information to pay off three credit card bills and his mother’s phone bill, which indicates he was responsible for four transactions.
|lfiOn cross examination, Tyler Brown denied calling Mr. Wallace, the State’s attorney, in November of 2009 and further denied being in Tennessee at that time because it was a violation of his probation. The State’s rebuttal witness, Mr. Schultz, played a voicemail from Tyler Brown to Mr. Wallace and further indicated that the call came from a Tennessee phone number.
The jury was presented with all of the evidence, and the jury apparently rejected defendant’s theory that Tyler Brown was the only party responsible in this crime. Testimony and a sworn affidavit were presented to indicate that Tyler Brown was the only person responsible for the crime. However, there were inconsistencies in Tyler Brown’s testimony regarding the amount of money his mother gave him to pay the AT & T bill. Further, Detective Wright testified that defendant admitted that she paid her bills online, which is inconsistent with Tyler Brown’s testimony that she gave him cash to pay the bill. Additionally, Tyler Brown asserted that he attempted four transactions, one to pay the AT & T bill for defendant; however, the State presented bank records of five transactions, four made to Tyler Brown’s account. This information corroborates the theory that defendant was responsible for one of the five transactions. Most significantly, the State presented evidence that Tyler Brown lied to avoid a probation violation. Additionally, evidence was presented that Tyler Brown did not want to see his mother return to jail and that he made an agreement with her to take responsibility for the crime.
Testimony was presented which showed that defendant and her son both had ac *279 cess to the victim’s account information. The jury reviewed the five ACH transactions admitted into evidence and deduced that the defendant was guilty beyond a reasonable doubt of access device fraud in between $300 and $500, |1fiwhich was for only one of the five transactions: the $413 AT & T transaction that was applied to defendant’s account.
The jurors clearly found the testimony of the State witnesses more credible than the testimony of the defense witness, Tyler Brown. The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier-of-fact. State v. Jones, 08-20, p. 7 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240, writ denied, 09-2394 (La.10/15/10), 46 So.3d 1282. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier-of-fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id.
Based on the foregoing, we find that the evidence, viewed in a light most favorable to the State, was sufficient to establish that defendant was guilty of the essential elements of the crime beyond a reasonable doubt.

ERROR PATENT DISCUSSION

The defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request. The following matter was discovered.
As noted by the State in its brief, the trial court erred in sentencing defendant under the habitual offender statute without diminution of the sentence for good time. Specifically, the trial court sentenced the defendant to 20 years at hard labor with the first three years being served “without benefit of good time.” Id.
117The provisions of LSA-R.S. 15:571.3(0 prohibit giving credit for good time served under particular circumstances. These provisions are directed to the Department of Corrections exclusively and the trial court, with limited exceptions, has no power to make eligibility determinations for diminution of sentence. See State v. Hotard, 04-1092, p. 1 (La.10/15/04), 885 So.2d 533, 534 (citing State ex rel. Simmons v. Stalder, 93-1852 (La.1/26/96), 666 So.2d 661); State v. Carey, 07-674, p. 6 (La.App. 5 Cir. 12/27/07), 975 So.2d 27, 30-31, writ denied, 08-0430 (La.11/10/08), 996 So.2d 1064; and State v. Jackson, 07-975, p. 14 (La.App. 5 Cir. 4/15/08), 985 So.2d 246, 254. Although the foregoing statute indicates that the defendant is not eligible for good time credit, that determination is to be made by the Department of Corrections. Id.
Accordingly, we amend defendant’s sentence to remove the provision prohibiting defendant from earning good time. See, State v. Carey, supra; State v. Jackson, supra. In all other respects, defendant’s conviction and sentence are affirmed.

CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED.

. The defendant’s son, Tyler Brown, was also charged on the bill of information with the same offense; however, he pled guilty on April 1, 2009.

. It appears that Detective Wright incorrectly refers to some of defendant's printed records coming from "Red Dot or Brown Dot”; however, State’s Exhibit 11 reflects that the records were printed from greendotonline.com.

. Also on rebuttal, Ms. Scavo identified this number to belong to Linda Ward, the wife of Tyler Brown’s uncle, who resided in Tennessee.