| STATE OF LOUISIANA | * | NO. 2023-KA-0669 |
| VERSUS | * | COURT OF APPEAL |
| DEVION D TAYLOR | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-212, SECTION "A"
Honorable Simone A. Levine,
* * * * * *
**Judge Joy Cossich Lobrano**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Joy Cossich Lobrano, Judge
Karen K. Herman)

Jane Louise Beebe
LOUSIANA APPELLATE PROJECT
P. O. Box 463
Addis, LA 70710

COUNSEL FOR DEFENDANT/APPELLANT

Jason R. Williams
District Attorney
Brad Scott
Chief of Appeals
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119

COUNSEL FOR STATE OF LOUISIANA/APPELLEE

**CONVICTIONS AFFIRMED; SENTENCES ON SECOND DEGREE
MURDER CONVICTIONS AFFIRMED; REMANDED FOR PUPRPOSE
OF AMENDING OBSTRUCTION OF JUSTICE SENTENCE TO DELETE
ILLEGAL RESTRICTION ON PAROLE ELIGIBILITY**

**JUNE 27, 2025**

*JCL*

*DLD*

*KKH*

This is a criminal case. Devion Taylor ("Defendant") appeals his convictions of two counts of second degree murder and one count of obstruction of justice and his consecutive sentence for obstruction of justice. For the following reasons, we affirm the convictions and affirm the sentence on each of the second degree murder counts. The district court erred in sentencing Defendant on the obstruction of justice count by imposing the sentence without the benefit of parole. Therefore, we remand the matter to the district court to amend the sentence on the obstruction of justice count to delete the illegal restriction on parole eligibility. The district court is also ordered to instruct the Clerk of Criminal District Court to transmit the corrected sentencing document to the officer in charge of the institution to which Defendant has been sentenced.

## PROCEDURAL HISTORY

On May 5, 2022, an Orleans Parish Grand Jury returned an indictment against Defendant, charging him with two counts of second degree murder, a violation of La. R.S. 14:30.1, and one count of obstruction of justice, a violation of La. R.S. 14:130.1. At his arraignment conducted on May 19, 2022, Defendant entered a plea of not guilty to all of the charges.

1

Defendant filed a motion to suppress his statement. The hearing on the motion to suppress took place over the course of three days -- October 19, 2022, December 13, 2022, and January 4, 2023; and on January 31, 2023, the district court denied the motion to suppress statement.

The case proceeded to trial on April 24, 2023. Prior to the commencement of trial, Defendant filed several pre-trial motions, including a motion to exclude opinion testimony of Jessica Nezat. The district court deferred ruling on the motion until trial. Jessica Nezat's qualifications were presented during her *voir dire*, and the district court accepted her as an expert in cell phone analytics over the defense's objection.

At the conclusion of the trial, the jury returned a verdict finding Defendant guilty as charged on all counts. Defendant subsequently filed a motion for new trial and a motion for post-verdict judgment of acquittal, which the district court denied on May 25, 2023.

A sentencing hearing was conducted on June 8, 2023. After the presentation of victim impact evidence, the district court sentenced Defendant to life imprisonment on each of the second degree murder counts and to forty (40) years on the obstruction of justice count, with the sentences to be served at hard labor without benefit of parole, probation, or suspension of sentence. The district court ordered the life sentences to be served concurrently and the obstruction of justice sentence to be served consecutively to the other sentences. Defendant timely instituted this appeal.

## STATEMENT OF FACTS

The pertinent testimony elicited at trial is as follows:

NOPD Detective Nicole Alcala testified that on January 8, 2022 she responded as the lead investigator to the scene of the murder of Kane Sanders ("Sanders") and Christopher Cornelius ("Cornelius"), who were killed inside a vehicle in the 8700 block of Curran Boulevard. The vehicle had collided with a parked, unoccupied vehicle, and it appeared that the driver, Sanders, had suffered multiple gunshot wounds that caused him to lose control of his vehicle.

During a search of the vehicle, officers found a cell phone belonging to Sanders and a large bag of marijuana on the floorboard near his feet. Three live rounds were found in a backpack on the front passenger seat, and casings, a magazine, and bullet fragments were also found inside the vehicle. A second cell phone, which was registered to Defendant's father, and a wallet containing Defendant's identification card, were found outside of the vehicle. A projectile and number of spent handgun and rifle casings were also collected from outside the vehicle. The interior of the vehicle had suffered damage from a gun which appeared to have been fired from the back seat of the vehicle

On cross-examination, Detective Alcala testified that Sanders and Cornelius appeared to have been shot from the back. Specifically, she testified that "empty casings, deceased individuals, [and] multiple ballistic damage to the interior of the vehicle" indicated that shots were fired from within the vehicle. DNA testing on the ballistics yielded inconclusive results, and Defendant tested negative for gunshot residue.

Dr. Samantha Huber, the chief pathologist for the Orleans Parish Coroner's Office, qualified by the court as an expert in forensic pathology, testified that she performed the autopsies on the victims and authored the associated toxicology reports. She stated that Sanders suffered a total of ten gunshot wounds, which

pierced a rib, part of his spinal column, his lungs, stomach, aorta, pancreas, diaphragm, and liver, and opined that gunshot wounds caused his death. With the exception of one bullet which entered Sanders's front thigh as he was apparently seated, the wounds resulted from bullets which entered his body from back to front. She stated that Cornelius sustained five gunshot wounds to the back of his head, all of which were potentially fatal. One gunshot wound was caused by a shot fired about an inch or two from his head, and the other four gunshot wounds appeared to have been fired through the headrest. Cornelius also sustained two gunshot wounds to his spine and shoulder. Dr. Huber also testified that the toxicology reports reflected the presence of caffeine and THC in both victims and the presence of nicotine in Cornelius.

Kenneth Leary, a firearms examiner for the NOPD and a ballistics expert, testified that six forty-five-millimeter caliber cartridge casings fired from the same weapon, likely an AR-15, were found on the scene of the shooting. He also testified that several nine-millimeter caliber cartridge casings that were found on the scene, including inside the vehicle, were all fired from the same weapon, a nine-millimeter pistol. He testified that the empty clip found in the vehicle would fit a Glock nine-millimeter gun.

Mr. Leary additionally testified that the projectile recovered from Cornelius during his autopsy was consistent with .38 caliber ammunition, "which includes nine-millimeter." A .38 caliber projectile recovered during Sanders's autopsy possessed similar rifling characteristics to the projectile recovered from Cornelius, but Mr. Leary could not determine whether they were fired from the same weapon.

On cross-examination, Mr. Leary testified that the ballistics evidence was entered into the National Integrated Ballistic Information Network and was not found to have been linked to any other criminal activity.

Detective Alan Seaton testified that he was employed by NOPD in the digital forensics unit. He testified that he processed three of the four cell phones recovered in this case, including Sanders's phone and a phone found on the scene that was registered to Defendant's father. The "phone dump" of Sanders's phone reflected messages between his phone and the phone registered to Defendant's father, as well as the locations of both cellphones.[1]

Detective Alcala was recalled by the State to offer further testimony. She testified that NOPD received a dispatch call advising that an individual had arrived at New Orleans East Hospital with a gunshot wound. A detective arrived at the hospital and learned that the individual, who was identified as Defendant, had been transported to University Medical Center, a trauma hospital where all gunshot wound victims are treated. Detective Alcala interviewed Defendant at University Medical Center. When she initially spoke to him, she did not know his involvement in the shooting. In the incident recall, Defendant had been referred to as a "potential victim" of the shooting and further, the information provided by New Orleans East Hospital to dispatch reflected that Defendant had stated that he was shot at a location different from the location of the shooting of Sanders and Cornelius.

Defendant told Detective Alcala that he was shot on San Francisco Street; however, officers were unable to locate a "San Francisco Street" in New Orleans. Defendant also told her that after he was shot, he stopped at the house of a

---

[1] The "phone dump" of Sanders's phone was introduced as State Exhibit 28.

5

neighbor who was having a party. However, during Detective Alcala's investigation, she learned that Defendant had gone home before proceeding to the hospital and that he was dropped off at the hospital in a vehicle belonging to a neighbor. Detective Alcala learned that there had not been a party at the neighbor's house. Defendant also told Detective Alcala that "strangers" brought him to the hospital in a "four-door F150"; however, the hospital's video footage depicted Defendant being dropped off in a Suburban or a Tahoe.

Detective Alcala testified that Defendant physically matched the photograph in the wallet found at the scene. She collected bright blue basketball shorts from Defendant which he had been seen wearing in the hospital footage and which also could be seen under a pair of black athletic pants in the first mention "RTCC" without stating that it is Real Time Crime Camera ("RTCC") footage. Detective Alcala identified Defendant in the RTCC footage as it was played for the jury and stated that he wore "a light-colored hoodie, gray or white in color, black athletic pants that have white stripes running vertically down the sides and a pair of tan colored . . . boots." The footage depicted Defendant talking to two individuals at the time Sanders and Cornelius arrived in their vehicle. One of those individuals later fired shots toward the vehicle, and the other individual shot an AR-15 near where casings were later found. Detective Alcala testified that Defendant appeared to be in the back seat of the vehicle. At one point, she identified an object falling out of the rear passenger door of the vehicle as it drove away and landing where the wallet containing Defendant's identification card was found.

Detective Alcala testified that she performed a buccal swab and gun residue test on Defendant. She testified that the gunshot residue test was negative and explained that the time lapse between the shooting and Defendant's hospital

treatment, during which he had opportunities to wash his hands, could have resulted in the dissipation of any gunshot residue. Forensic testing of the cell phones revealed that Defendant had sent Sanders a map with a "pin drop" from his cell phone to his exact location. In a text message, Defendant summoned Sanders to the location where he and Cornelius were later killed. Sanders then sent a message to Defendant stating that he was "outside," and Defendant answered, "okay."

During cross-examination, Detective Alcala testified that because DNA testing of casings collected at the scene rendered no results, there could be no comparison of that evidence to Defendant's DNA.

On redirect examination, Detective Alcala testified that phone records reflected that Defendant contacted Sanders about purchasing marijuana and chose the location where to meet him. She testified that the RTCC video footage depicted Defendant arriving at the location forty minutes before Sanders and Cornelius arrived. Defendant met with two associates and appeared to be waiting for Sanders and Cornelius. Upon the arrival of Sanders and Cornelius, both associates fired shots at the vehicle, and Defendant entered the vehicle. Detective Alcala testified that the firearms used in the shooting were never located.

Jessica Nezat, Director of the NOPD's Analytics Unit, qualified to testify as an expert in cellphone data analysis. She prepared a report in this case based on her analysis of cellphone data acquired pursuant to a warrant. Director Nezat testified that the phone registered to Defendant's father and found at the crime scene had bounced off towers near the scene between 5:40 and 6:27 p.m. on January 8, 2022. She testified that there was no data after 6:27 p.m. because, pursuant to NOPD

7

procedure, the phone was secured in a faraday bag to block connectivity so that it could not be erased remotely.

## ASSIGNMENTS OF ERROR

On appeal, Defendant raises the following assignments of error:

> 1. The trial court erred in [] denying the defense's motion to suppress statements.
>
> 2. The trial court erred when it failed to produce a complete transcript of the proceedings in the trial court, specifically the ruling on the motion to suppress the statements, thus mandating that [Defendant's] conviction be vacated and the matter set for a new trial.
>
> 3. The trial court erred when it accepted Nezat as an expert, for the first time, in cell phone analysis, over defense objection, and without conducting the requisite *Daubert* hearing.
>
> 4. The trial court erred in allowing the state to provide the defense with photographs mere minutes before allowing the state to use them at trial and by allowing the state to provide the defense with the triple I/rap sheets on two witnesses only minutes before they were allowed to testify, thus providing no opportunity for the defense to investigate or present a defense.
>
> 5. The trial court erred in sentencing [Defendant] to a sentence that was consecutive to his two life sentences.

## ERRORS PATENT

In accordance with La. C.Cr.P. art. 920(2), all appeals are reviewed for errors patent on the face of the record.[2] A review of the record reveals one error patent.

The district court imposed Defendant's sentence on his obstruction of justice conviction without the benefit of parole. However, the penalty provision of the

---

[2] An error patent is "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2).

applicable statute, La. R.S. 14:130.1(B), does not authorize such a restriction on Defendant's parole eligibility.[3] Thus, the parole restriction rendered the sentence illegal, and the sentence must be amended to delete the illegal restriction on parole eligibility.

## DISCUSSION

### *Assignment of Error 1: Motion to Suppress Statement*

Defendant asserts in his first assignment of error that he was the subject of a custodial investigation at the time he provided statements to homicide detectives in his room at University Medical Center, and that since he was not advised of his constitutional rights prior to questioning, the statements were improperly admitted at trial in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 86 S.Ct. 1602 (1966).

This Court addressed the standard of review for a motion to suppress in *State v. Debose*, 24-0217, pp. 6-7 (La. App. 4 Cir. 6/13/24), 390 So.3d 971, 977:

> District courts have great discretion when ruling on motions to suppress, and an appellate court will not disturb a district court's ruling on a motion to suppress unless the district court abused its discretion. *State v. Willis*, [ ]22-0452, pp. 6-7 (La. App. 4 Cir. 9/1/22), 348 So.3d 167, 172 (quoting *State v. Polkey*, [ ]20-0482, p. 3 (La. App. 4 Cir. 11/25/20), 310 So.3d 605, 608). The reason the district court's decision "on a motion to suppress ... is entitled to great weight" is "because the [district] court has the opportunity to observe the witnesses and weigh the credibility of their testimony."

---

[3] La. R.S. 14:130.1(B) provides, in pertinent part:

> B. Whoever commits the crime of obstruction of justice shall be subject to the following penalties:
> (1) When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, . . . the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.

> *Id.* at p. 7, 348 So.3d at 172 (alteration in original) (quoting *State ex rel. J.S.*, [ ]08-1401, p. 4 (La. App. 4 Cir. 2/18/09), 6 So.3d 904, 908). As this Court has previously explained though, "a motion to suppress presents a mixed question of law and fact." *Id.* (citing *Polkey*, [ ]20-0482, p. 4, 310 So.3d at 608). Thus, the appellate court reviews the underlying facts for an abuse of discretion "but reviews conclusions to be drawn from those facts *de novo*." *Id.* When the facts are not disputed, however, then the appellate court need only "consider whether the trial court came to the proper legal determination under the undisputed facts." *Id.*

The obligation to provide *Miranda* warnings attaches when a person is questioned by law enforcement after he has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *State v. Payne,* 01-3196, p. 7 (La. 12/4/02), 833 So.2d 927, 934. As such, *Miranda* warnings are applicable only when it is established that the defendant has been subject to a "custodial interrogation." *State v. Hunt,* 09-1589, p. 11 (La. 12/1/09), 25 So.3d 746, 754.

Custody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest; and, second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994); *see also State v. Hankton*, 12-0466, p. 13 (La. App. 4 Cir. 4/30/14), 140 So.3d 398, 407. To evaluate how a reasonable person in the defendant's position would gauge the breadth of his freedom of action, courts review the totality of the circumstances surrounding the interrogation, "including any circumstance that 'would have affected how a reasonable person' in the suspect's position 'would perceive his or

her freedom to leave,'" but ignoring the "subjective views harbored by either the interrogating officers or the person being questioned." *State v. Robertson*, 17-0398 p. 3 (La. App. 4 Cir. 5/12/17), 219 So.3d 1125, 1127-28 (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270-71, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011)). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *How*es *v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (internal citations omitted).

The Louisiana Supreme Court has noted that "[d]etention for a medical examination is not a situation that a reasonable person would find inherently coercive in the sense required by *Miranda*." *State v. Thornton*, 12-0095, p. 5 (La. 3/30/12), 83 So.3d 1024, 1026 (citing *Wilson v. Coon*, 808 F.2d 688, 690 (8th Cir. 1987). In *State v. Gill*, unpub., 09-2003 (La. App. 1 Cir. 3/26/10), 2010 WL 1170437 (La. App. 1st Cir. March 26, 2010), the police interrogated the defendant in the hospital following an automobile accident. The defendant argued the trial court erred by denying her motion to suppress her confession because she was not advised of her *Miranda* rights prior to being questioned as to whether she was the driver of the vehicle involved in the accident, and there was no testimony she would have been allowed to leave the hospital where she was being interviewed. *Id.*, 09-2003, 2010 WL 1170437, at *1. The First Circuit held that the defendant was not in police custody at the time of her initial statements, noting that "[t]here was no testimony that her freedom of movement was restricted in any manner prior to the time she was advised of her rights." *Id.*, 09-2003, 2010 WL 1170437, at *4.

During the hearings conducted on Defendant's motion to suppress statement, homicide detectives testified that on the night of the shooting, NOPD received a call from New Orleans East Hospital advising that a shooting victim had arrived at the hospital. A homicide detective was sent to the hospital and learned that the individual had been transported to University Medical Center.

In the meantime, officers learned that the name of the UMC patient was Devion Taylor, which was also the name of the person whose wallet was found at the Curran Boulevard shooting scene. The officers initially did not know how Defendant's wallet got on the scene until after they viewed the RTCC video footage at a reduced speed the day after they interviewed Defendant and observed the wallet fall out of the rear passenger side of the victim's vehicle onto the street. Detective Alcala procured a warrant for a gun residue test and a buccal swab; however, at the time the tests were performed, the officers did not know whether Defendant was involved in the Curran Boulevard shooting and if so, whether he was a victim, witness, or perpetrator.

The detectives testified that when they entered Defendant's hospital room, he had already told hospital staff that he had received the gunshot wound at a location other than 8700 Curran Boulevard. He stated that while walking to the store, someone in a black vehicle drove by and shot him. When Detective Brittany Kimbrough arrived at the hospital, Defendant provided the same account to her.

While executing the buccal swab warrant, Detective Alcala questioned Defendant about his gunshot wound and the events leading up to it, and he answered consistently with his statements to hospital personnel and Detective Kimbrough. Defendant was not advised of his *Miranda* rights until after he made the statements.

After reviewing the evidence and considering the totality of the circumstances in the present case, we find that the questioning conducted prior to the *Miranda* warnings did not constitute custodial interrogation within the meaning of *Miranda.* The circumstances present do not suggest that Defendant was detained or that his freedom of movement was restricted. At the time of the questioning, Defendant was not placed in handcuffs; was not under arrest; was not told that he was not free to leave; and was not prevented from leaving the hospital. Accordingly, the district court did not err in finding that he was not in custody when he made his statements, and *Miranda* warnings were not required. This assignment of error lacks merit.

### Assignment of Error 2: Absence of Transcript of Ruling on Motion to Suppress Statement

In his second assignment, Defendant asserts that the absence in the appellate record of the transcript of the January 31, 2023 ruling on his motion to suppress statement requires a reversal of his convictions. However, after Defendant filed his brief, the appellate record was supplemented with the transcript of the ruling. As such, this assignment is moot.

### Assignment of Error 3: Qualification of Jessica Nezat to Testify as an Expert

In his third assignment of error, Defendant asserts that the district court erred in qualifying Jessica Nezat to testify as an expert in GeoTime cell phone analysis because the State did not establish her "methodology and reasoning." Defendant contends that there was no "hearing or qualifications presented on this new area of expertise" and that his convictions were based on Ms. Nezat's "unfounded opinion."

In criminal cases, expert testimony is permissible to provide the trier of fact with a basic knowledge and background on a subject outside of a general layperson's knowledge. *See State v. Bozeman*, 06-679, p. 6 (La. App. 5 Cir. 1/30/07), 951 So.2d 1171, 1174. It should be introduced "for the purpose of giving the jurors a basis of knowledge and/or background information on a subject, based upon the expert's specialized knowledge or experience." *State v. Bosworth*, 593 So.2d 1356, 1360 (La. App. 4th Cir. 1992).

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *State v. Wright*, 11-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316. Additionally, the trial court enjoys wide discretion in determining who may be qualified as an expert and what expert testimony is admitted. *State v. Hampton*, 15-1222, p. 11 (La. App. 4 Cir. 12/23/15), 183 So.3d 769, 776.

Louisiana Code of Evidence article 702(A), at the time of Defendant's trial, provided:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

During voir dire, Ms. Nezat testified that she was director of the analytics unit at NOPD. She testified that she held certifications in GeoTime software and that she held a law enforcement analyst foundational certification through an

international association of crime analysts. She testified that "GeoTime is a software application that helps us visualize . . . cell phone data" and explained that "it doesn't change the data in any way, but it . . . allows us to look at it on both geospatials, so location, and temporum axis. So we can look at it by time and location." She testified that the protocol she followed using GeoTime was the customary accepted practice nationwide and that she had analyzed phones in sixty-two cases.

Ms. Nezat testified that she held a "desktop level one" certification with GeoTime software, explaining that it required "basic foundational skills in call detail records analysis," such as "how call towers work, what the data will look like and how to interpret carrier records because all carriers have slightly different ways of coding their records." She stated that she also had a "desktop two level certification," which she explained is "a more advanced analysis" involving the analysis of "multiple phones in the same plane, looking for pattern detection, [and] contact analysis." She further stated that she had an "enterprise" level certification in "detailed contact analysis" and that her "expert certification" in GeoTime was pending.

Considering the evidence presented of Ms. Nezat's extensive specialized training and work experience in the use of GeoTime software, we do not find that the district court abused its wide discretion in qualifying her to testify as an expert in GeoTime software analysis. Accordingly, this assignment lacks merit.

### Assignment of Error 4: Late Disclosure of Evidence

Taylor asserts that the State "seriously hamstrung the defense's right to present a defense by the late disclosure of potentially exculpatory evidence,"

namely, certain crime scene photos and the rap sheet of one of the State's witnesses.

**Crime Scene Photographs**

During her direct examination, Detective Alcala identified several photographs of the crime scene. Defense counsel stated that a group of the photographs had not been provided to the defense and that he therefore did not have an opportunity to view the photographs prior to trial. The court provided defense counsel time to view the photographs in chambers. After the recess, the prosecutor explained that the photographs had been sent to defense counsel, but that "they were sent through an evidence.com link which has been known to have the ability to have errors and problems with it," and noted that defense counsel viewed the photographs during the recess. Defense counsel then stated:

> I don't know the number, but there is a group of photographs that I did not have an opportunity to review prior to trial. I have, however, now had the opportunity to review them during trial. I'd just like the record to reflect that we didn't have them before court, and any objection that needs to be made about individual photos we'll make during the course and scope.

Thereafter, Defense counsel made no objections to any individual photographs.

The trial transcript reflects that once Defense counsel informed the trial court that he had not had an opportunity to view a group of crime scene photos that had been published to the jury, the court provided him an opportunity to review the photographs before Detective Alcala resumed her testimony. Counsel did not request additional time to review the photographs; rather, he appeared satisfied with his review of the photographs and stated that, if "need[ed]," he would object to individual photographs. Thereafter, he made no objection to any individual photograph. Accordingly, this assignment lacks merit.

**Disclosure of Rap Sheet**

The State called Aurora Sanders, Sanders's mother and Cornelius's cousin, to testify. Shortly before her testimony, the State disclosed her rap sheet, which reflected a November, 2021 arrest. Defendant objected to the timeliness of the State's disclosure.

La. C.Cr.P. art. 717 requires the State, upon written request of the defendant, to turn over copies of the State's witnesses' arrest and conviction records.[4] The purpose of pretrial discovery procedures is to eliminate unwarranted prejudice to a defendant which could arise from surprise testimony. *State v. Elie*, 05-1569, pp. 15-16 (La. 7/10/06), 936 So.2d 791, 802. However, the State's failure to comply with discovery requests does not constitute reversible error unless actual prejudice results to the defendant. *Id.*

Ms. Sanders did not testify as to any facts relating to the shootings. Her testimony was limited to identifying photographs of Sanders and Cornelius, and describing the loving relationship Sanders had with his family. Defense counsel did not cross-examine her. We find that the State's disclosure of Ms. Sanders's rap sheet shortly before her testimony did not result in prejudice to Defendant. Accordingly, this assignment lacks merit.

***Assignment of Error 5: Excessive Sentence***

In his fifth assignment of error, Defendant asserts that the consecutive nature of his obstruction of justice sentence makes it excessive. The record reflects that Defendant did not object to his sentence at the time it was imposed, nor did he file a motion to reconsider sentence pursuant to La. C.Cr.P. art. 881.1. The failure to

---

[4] Under La. C.Cr.P. art. 717(C), "[t]he district attorney shall not be required to disclose . . . records of arrests and convictions until the commencement of trial."

file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness only. *State v. Manuel*, 21-0273, p. 14 (La. App. 4 Cir. 4/6/22), 337 So.3d 967, 975; *see also State v. DeGruy*, 20-0290, p. 8 (La. App. 4 Cir. 10/29/20), 307 So.3d 258, 264. The excessiveness of a consecutive sentence is not included in a bare constitutional review. *State v. Durant*, 24-243, p. 5 (La. App. 5 Cir. 2/26/25), 406 So.3d 736, 743 (citing *State v. Rodgers*, 16-14, p. 18 (La. App. 5 Cir. 10/26/16), 202 So.3d 1189, 1200). Accordingly, we find Defendant is precluded from challenging as excessive the consecutive nature of his obstruction of justice sentence.

## CONCLUSION

For the foregoing reasons, Defendant's convictions on second degree murder and obstruction of justice are affirmed, and his sentences on his second degree murder convictions are affirmed. The matter is remanded to the district court to amend Defendant's sentence for obstruction of justice to delete the illegal restriction on parole eligibility. We order that the district court instruct the Clerk of Criminal District Court to transmit the corrected sentencing document to the officer in charge of the institution to which Defendant has been sentenced.

**CONVICTIONS AFFIRMED; SENTENCES ON SECOND DEGREE MURDER CONVICTIONS AFFIRMED; REMANDED FOR PUPRPOSE OF AMENDING OBSTRUCTION OF JUSTICE SENTENCE TO DELETE ILLEGAL RESTRICTION ON PAROLE ELIGIBILITY**